## THE STATE v. KING, Appellant.

Division Two, March 6, 1906.

1. **INSTRUCTIONS: No Exceptions.** Where the record shows that none of the defendant's instructions were refused, and the motion for new trial does not allege any error in the instructions given by the court, and there is no exception to the failure of the court to declare all the law of the case, and the failure of the court to instruct on any point is not at the time called to its attention, an assignment in the motion for new trial that "the court erred in not instructing the jury on all points in the case under the evidence," is not sufficient to require the appellate court to pass upon the instructions which were given.

2. **NEW TRIAL: Newly-Discovered Evidence: Affidavit.** A motion for new trial on the ground of newly-discovered evidence is properly overruled where it appears that the evidence would be merely cumulative, and due diligence has not been used to procure the testimony at the trial, and where defendant files no affidavit in support of the motion.

State v. King.

3.  **VERDICT: Sufficiency.** The verdict was in the following form: "We. the jury find the defendant guilty of murder in the second degree, and assess his punishment at teen years. (10)." *Held*, not reversible error. And even if it were, since the court sentenced defendant to the minimum punishment fixed by statute, he can not complain.

Appeal from Christian Circuit Court.—*Hon. John T. Moore*, Judge.

AFFIRMED.

*Troy Pace* and *E. G. Mitchell* for appellant.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1)  The instructions fully and fairly presented the case to the jury, but, as defendant failed to make any objections to. same in his motion for a new trial, that point has been waived. State v. Whitsell, 142 Mo. 474; State v. Headrick, 149 Mo. 396.  (2)  In his motion for a new trial defendant alleges that he had discovered new and material evidence. The failure to bring out the desired evidence was due to no fault of the State, but to the neglect of defendant's counsel, for which defendant should suffer. State v. Cantlin, 118 Mo. 111; Cook v. Railroad, 56 Mo. 383. On the subject of the affidavit in support of the newly-discovered evidence, this court said: "Moreover, the motion for a new trial was not accompanied by the affidavit of defendant, as it should have been." State v. Campbell, 115 Mo. 393; State v. McLaughlin, 27 Mo. 111; State v. Lucas, 147 Mo. 72; State v. Miller, 144 Mo. 29; Graham & Waterman on New Trials, p. 1067.  (3)  The alleged failure of the trial court to fully instruct upon all the law applicable to the case cannot be considered, because no exceptions were saved at the time to such alleged failure. State v. Cantlin, 118 Mo. 111; State v. Albright, 144 Mo.

638. The verdict is not insufficient by reason of the failure of the jury to use the words "in the penitentiary." The jury, by said verdict, did find defendant guilty of murder in the second degree, which was sufficient. Defendant can not complain because the jury misspelled the word "ten," for the same reason. R. S. 1899, secs. 2649 and 2650.

GANTT, J.—On December 23, 1903, the prosecuting attorney of Taney county filed an information, duly verified, charging the defendant and West Hudson, Bill, alias "Red" Barker, and Clyde, alias "Curley" Elliott, with murder in the first degree. The date of the commission of the alleged crime was the 15th day of December, 1903, and the name of the deceased was Henry Barchman. Defendant applied for and was granted a change of venue, on account of the prejudice of the inhabitants of Taney county; the cause was accordingly sent to Christian county. In the latter-named county, defendant entered a plea of not guilty, was granted a severance, and convicted of murder in the second degree at the December term, 1904. The punishment assessed was ten years in the penitentiary. After the usual unsuccessful motions for new trial and in arrest of judgment, defendant appealed.

The State's evidence tended to show that, for some time prior to December 15, 1903, Oliver & Thompson conducted a saloon in Taney county, a short distance from the line between Missouri and Arkansas; it was known as the "State line saloon," and the deceased and John Hart were the bartenders. Thompson also conducted a saloon at Branson, in Taney county, and the defendant had been his bartender, but quit on account of trouble with Thompson a few days before the homicide. Omaha, Arkansas, was a small village, a few miles from the State line, and a number of men were engaged in a railroad camp near there, among them being Hudson, Elliott and Barker, who are jointly charged with defendant. The day before the shooting,

Elliott, Barker and defendant had some trouble with Oliver, one of the proprietors of the "State line saloon." On said day defendant and the others went to said saloon, taking a girl with them from Omaha. They soon got into a fight with some Irishmen, and Oliver told them to get out. Turning to defendant Oliver said, "You fellows can close Charley Thompson's doors, and go over to Forsythe and have a big time, but no one can close mine. If they do, they can close over the best son-of-a-bitch they ever saw." After returning to Omaha, Barker was heard to say that Oliver had run him out of his saloon and that he was going back to settle with him. He further said, "I am going back to kill Jess Oliver." Hudson and defendant were present in this room and took part with Barker in the conversation. The evidence showed that Barker, Hudson and Elliott were disorderly and dangerous men; and Thompson had requested defendant to get them away from his saloon at Branson, as they were causing him trouble and people were complaining about them. For some days prior to the final difficulty, there seemed to be an intimacy existing between defendant and these three; in fact, they seemed to be together continually. On December 15, 1903, defendant and the same three men again hired a hack and were driven from Omaha to the State line saloon, reaching there between one and two o'clock. All of them at once entered the saloon, and remained in there most of the time, drinking and talking until the shooting occurred. These men got into trouble with an Irishman in the saloon, made him treat the crowd, and then they retired for a few minutes. After talking together on the outside, they came back into the saloon and partook of another round of drinks. In another tussle with the Irishman, the men got him on the floor and were handling him pretty rough, when one of the bartenders, John Hart, asked defendant not to do that. The four men then left the saloon, and in a few minutes all came back and ordered another round of drinks.

Hudson drew his pistol and, without any apparent reason, fired it three times. Upon a protest from the bartender and an appeal to defendant to stop it, defendant said, "All right." Defendant then ordered drinks for all and called on all to partake of same; accordingly, everyone in the room lined up at the bar, bartender Hart stooped down to get whiskey from a demijohn for some of them, and deceased began to pull corks from bottles for those that had ordered beer. While thus engaged, Hudson rushed towards deceased, saying, "I will kill that three-fingered-son-of-a-bitch" (referring to deceased, who had only three fingers on one hand). At that time defendant and Barker had each a pistol in his hand; defendant's pistol was pointed towards bartender Hart. Someone called out, "Hands off." At once a shot was fired, and deceased exclaimed, "Don't shoot any more; you have killed me now." Hudson, Barker and a number of others ran out the front door of the saloon; but defendant and Elliott remained. Defendant continued to hold his pistol on Hart, and told him to give him five or ten dollars. Hart gave him the only bill he had in the cash drawer, but did not notice what denomination it was. While defendant was getting this money from Hart, Mr. Powers came into the saloon to see what was the trouble, and saw Elliott sitting straddle of deceased. As Mr. Powers entered the door, Elliott drew his pistol and commanded him to go back, which he did. In a little while Elliott and defendant came out, and Elliott told Mr. Powers he could now come in if he wanted to. Some one asked who did that shooting, and Hudson said, "I shot the son-of-a-bitch." Deceased was picked up and carried to a room over Powers' restaurant, where he lingered until eleven o'clock the next night, when he died. An examination showed that the deceased received a gunshot wound on the left side of the abdomen, four inches to the left of the navel, and that the bullet passed through his body and out at the back. Deceased seemed

to think his condition serious, as he stated to Mrs. Pow-
ers, while being taken to her room, that there would
soon be one man less.  At one time he had hope of re-
covery; but his suffering was so great that in less than
five minutes he changed his mind.  The physician told
deceased that he could not recover, that he was bound
to die, and deceased agreed with him.  Deceased then
made a statement, in which he said that Wes Hudson
shot him, and that he (deceased) was doing nothing at
the time; that he did not have any pistol.  About two
minutes after the shooting, defendant, Hudson, Elliott
and Barker, each one still carrying a pistol, met a short
distance away from the State line saloon, ordered their
hack and drove to Omaha.  James Langwell testified
that he drove the hack, and that Elliott sat on the front
seat with him; and that the other three sat on the back
seat of the hack.  That during the ride to Omaha, one
of the men on the back seat shot a hole through Hud-
son's hat.  That the men had him stop the hack, and all
of them got out and went behind the hack, when one of
them fired a shot.  After reaching Omaha, defendant
told several persons that there had been a shooting over
at the State line saloon; that Hudson had shot the bar-
tender; that the bartender had shot several times at
Hudson  and  defendant;  that  several  shots  passed
through defendant's clothes; that defendant and Hud-
son had shot several times at the bartender, and that
Hudson hit him first.  Defendant showed a hole in his
shirt and one in his coat and collar, which he claimed
were made by bullets from deceased's pistol.  At that
time Hudson exhibited his hat, which had a hole in it,
and which they claimed had been made by one of de-
ceased's bullets.  Mrs. Middleton, who had charge of
the hotel, at Omaha, heard defendant say, after his
return from the State line saloon, "We had to kill a
man."  In response to a question from David Eoff as
to how it happened that he did such a cobbled-up job
as that, Hudson replied, "I don't know, Uncle David,

how it happened; I only wish I had done a better job.''
Defendant then said, ''Well, we had to shoot him, if he
hadn't of shot him, I would.'' In showing constable
Davis some holes in his coat and vest, which he claimed
deceased had shot in there, defendant said, ''If Wes
Hudson hadn't of done it I would have had to have
done it.'' In the presence of defendant, Hudson said
that he (Hudson) ''shot the fellow just to see him buck
himself to death.'' After these various statements,
defendant telephoned to the sheriff and told him to
come to Omaha, as a man had been killed.

The defendant's evidence tended to show that,
prior to this trouble, defendant enjoyed a good reputa-
tion as a law-abiding man. That while the defendant
went to the State line saloon both days in company with
Hudson, Elliott and Barker, and was present when
Hudson shot deceased, yet defendant had nothing to do
with said shooting, and did not aid, assist nor counsel
it. Defendant admitted having a pistol at said saloon,
and admitted having a little trouble with one of the
proprietors of said saloon, but denied making the state-
ments which the State's witnesses attributed to him in
reference to the killing; but admitted shooting a hole
in Hudson's hat, and that Barker shot holes in his
(defendant's) coat and vest. Defendant claimed that
he was on friendly terms with deceased, and that on
both occasions he (defendant) was trying to keep the
other men quiet. That the reason he went with Barker,
Elliott and Hudson was that Mr. Thompson was afraid
of them, and asked defendant to take them away to
some place where they would not bother him. Defend-
ant also testified that deceased threw some beer bottles
at Hudson just before the last shot was fired; and that
he (defendant) was in the act of picking up his change
from the bar when he heard said shot. In all that de-
fendant testified to in reference to his presence and
conduct in the saloon on the day of the difficulty he was
fully corroborated by one Thomas Williams, a witness,

who testified that he was a farmer of fifty years' experience, a justice of the peace of sixteen years' standing, and had been commander of the G. A. R. post. Mr. Williams, who claimed to have been present from the beginning to the end of the difficulty in the saloon, even made a stronger case for defendant than was made by defendant himself. Although Mr. Williams lived in Boone county, Arkansas, he did not appear as a witness at the trial, but his deposition was taken at Omaha and read by defendant.

In rebuttal, the State proved by several witnesses that Mr. Williams was not in the saloon at the time of the difficulty, but was some two hundred yards away, and asked what was the matter when he heard the shooting and saw a boy running away.

I. The information was sufficient. It followed a number of approved precedents in this State; indeed, counsel for the defendant do not challenge it in their brief.

II. The only error assigned by the learned counsel for the defendant in their brief is the incorrectness of one of the instructions. In his motion for new trial, the defendant nowhere assigns any objections or errors to the instructions given by the court. And the record shows that none of defendant's instructions were refused. It is true that one of the counsel for the defendant, in one of the affidavits filed in support of motion for new trial, does state, "The defendant asked the court to give cautionary instructions and the court agreed to give said instructions, but forgot it, and failed to do so." What the nature of the said cautionary instructions were, and on what subject counsel desired the jury to be cautioned, the affidavit does not state, but the record does show that there were no refused instructions, and shows no exceptions on the part of the defendant to the failure of the court to

194 Sup—31

instruct on all of the law applicable to the case.   It
would seem too clear, in the light of the uniform prac-
tice of this court, at least since the case of State v.
Cantlin, 118 Mo. 111, that the instructions of the court
are not before us for review because the motion for
new trial does not allege any error in those given by
the court of its own motion, and there was no exception
to the failure of the court to declare all the law of the
case, and the failure of the court to instruct upon any
proposition of law was not at that time called to its
attention.   But it is now insisted by counsel in their
brief that the fourth assignment in their motion for
new trial, to-wit, ''That the court erred in not instruct-
ing the jury on all points in the case under the evi-
dence,'' is sufficiently broad to require this court to
pass upon any error or inaccuracy in the instructions
given by the court.   We think it is too plain for dis-
cussion that a motion for new trial which nowhere
challenges the correctness of instructions given by a
trial court, and merely assigns as error the failure to
instruct on all the points in the case, is not sufficient to
require this court to pass upon the sufficiency of the in-
structions that were really given upon the points which
the court deemed necessary.   It would be manifest
injustice to the circuit court.   If counsel deemed that
the circuit court had erred in giving any instruction,
it was their duty to call the circuit court's attention
to any error therein, and afford that court an oppor-
tunity to correct its own errors, and thus save the un-
necessary delay and cost of an appeal in an important
criminal prosecution.   In this case, however, it is
equally clear that inasmuch as counsel saved no excep-
tions to the failure of the court to instruct upon all
the points in the case, this assignment itself is not
sufficient to permit or require an examination by this
court of any alleged errors in the instructions.   [State
v. Whitsell, 142 Mo. l. c. 474; State v. Headrick, 149
Mo. 396.]

III.  In his motion for new trial, the defendant alleges that he had discovered new and material evidence, and the affidavits of Taylor, Langwell and Pace were filed in support of this ground for a new trial. The main point sought to be established by these affidavits seems to have been that Justice Williams, who testified in behalf of the defendant, was in the saloon at the time of the homicide, or had been just immediately before the shooting began. Williams testified that he was in the saloon at the time of the homicide, and the defendant testified, also, that Williams was present. On the contrary, the witnesses Ramsey and Powers both testified that Williams had left the saloon, and did not know of the shooting of deceased by defendant until Ramsey met him as he was on his way to get a horse and send for a physician, after the deceased had been removed from the saloon and taken to the restaurant, and, therefore, it would have been a physical impossibility for Williams to have witnessed the facts to which he testified in his examination.  That the evidence of Taylor that Williams was present was entirely cumulative, is perfectly obvious. Moreover, this affidavit disclosed no diligence whatever on the part of the defendant and his counsel to procure Taylor's evidence at the trial.  It is significant that the defendant was convicted on the 5th of December, 1904, and on this same day this affidavit of Taylor's was made and sworn to before the clerk of the circuit court of Christian county.  How Taylor happened to leave Taney county and attend this trial in Christian county, and not testify for the defendant on the trial, and yet be ready and willing to make this affidavit on the day the verdict was rendered, is not explained by the defendant or the witness who made the affidavit. Langwell, one of the other affiants, was a witness and testified at the trial.  He testified that Williams was in the saloon less than twenty minutes before the shooting.  As to this proposition there was absolutely no

conflict; indeed, the State's own testimony tended to show that Williams was in the saloon a short time before the killing, but had left and gone down the road, where he was met by the witness Ramsey, and was told about the killing for the first time, some ten or fifteen minutes, at least, after it had occurred. The failure, however, to prove this fact by Langwell was owing entirely to neglect of defendant's counsel to ask him about it when he was on the stand. But over and beyond all of this, the defendant himself filed no affidavit in support of his motion for new trial on the ground of newly-discovered evidence, and it is too well settled to admit of question that such an affidavit by the defendant is necessary. [State v. Campbell, 115 Mo. l. c. 393; State v. McLaughlin, 27 Mo. 111; State v. Gordon, 153 Mo. 576; State v. Lucas, 147 Mo. l. c. 72.] And what has already been said applies with equal force to the affidavit of Mr. Pace, one of the defendant's attorneys in the case. No error was committed in refusing a new trial on the ground of newly-discovered evidence.

IV. The verdict of the jury was in this form: "We the jury, find the defendant guilty of murder in the second degree, and assess his punishment at teen years. (10.)" No point is made by counsel as to the insufficiency of this verdict, but the verdict is a part of the record proper, and is before us for review without exception taken to it in the circuit court. Even if the misspelling of the word "ten" should be held erroneous, and the failure to add the words "in the penitentiary," we are of the opinion that the error is not a reversible one. The jury distinctly found the defendant guilty of murder in the second degree, and if we are to regard it as if no punishment had been assessed by the jury, then the court by a plain statutory provision had power, and indeed it was its duty to have fixed the defendant's punishment for the offense of which he was found guilty. Section 2649, Revised

Statutes 1899, provides: "Where the jury find a verdict of guilty, and fail to agree on the punishment to be inflicted, or do not declare such punishment by their verdict, or assess a punishment not authorized by law, and in all cases of judgment by confession, the court shall assess and declare the punishment, and render judgment accordingly," and this the court did in this case, and sentenced the defendant to be confined in the penitentiary of the State of Missouri, for a period of ten years from the 5th day of December, 1904, or until otherwise discharged in due course of law. [State v. Gordon, 153 Mo. 576; State v. Thornhill, 174 Mo. 364; State v. Hamey, 168 Mo. 167.]

As the court sentenced the defendant to the least punishment affixed by the statute for murder in the second degree, it is obvious that he had no cause of complaint on this score.

After a review of all the evidence and the record in this cause, we are of the opinion that no error was committed in the proceedings and trial of the defendant, which would justify a reversal by this court.

The judgment must be and is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.