THE STATE v. HEADRICK, Appellant.

Division Two, May 9, 1899.

1.  **Change of Venue**: AFFIDAVIT OF DEFENDANT ONLY.   A defendant who files his petition for change of venue and supports it only by his own affidavit, is not entitled to prove its allegations by oral testimony nor is he entitled to a change of venue.

2.  ————: PURELY STATUTORY.   The right to a change of venue is purely statutory and the party seeking it must comply with the substantial requirements of the statute.

3.  **Affidavit**: DEFINED.   The word affidavit means an oath reduced to writing.

4.  **Change of Venue**: PREJUDICE OF INHABITANTS.   Where the application alleges as the ground for a change of venue the prejudice of the inhabitants of the county, and the evidence shows' that what prejudice existed was entirely local and such only as is to be found always among the relatives and intimate friends of the murdered person, it is no abuse of the discretion of the trial court to deny the application.

5. **Appellate Practice:** REFUSING INSTRUCTIONS: NO EXCEPTIONS. Unless the motion for a new trial contains some request that the verdict be set aside on the ground of error in the giving or refusing of instructions, the action of the trial court is not reviewable.

*Appeal from Cape Girardeau Circuit Court.*—Hon. HENRY C. RILEY, Judge.

AFFIRMED.

EDW. D. HAYS and L. CARUTHERS for appellant.

(1) The court erred in not permitting defendant to offer sworn oral testimony in support of his application for a change of venue in lieu of affidavits. The sworn oral testimony of a witness before a court is substantially an affidavit. To deny the defendant the right of proving the substance of his application for a change of venue by the oral testimony of two or more creditable, disinterested citizens instead of the affidavits of such citizens is to permit the merest technicality to defeat the ends and the aims of justice. In a case like the one under consideration it is easy to conceive of a condition of public prejudice so aggravated that persons might refuse to voluntarily furnish affidavits of prejudice. The real meaning of the term affidavit is a statement under oath. Smith v. Benton, 15 Mo. 371; Laswell v. Presbyterian Church, 46 Mo. 279; State v. Bennett, 102 Mo. 356. (2) The court erred in overruling defendant's application for a change of venue when supported by the affidavits of two credible disinterested citizens of the county. R. S. 1889, secs. 2153 and 4156; Laws 1895, p. 162; State v. Turlington, 102 Mo. 642; Railroad v. Railroad, 118 Mo. 599.

EDWARD C. CROW, Attorney-General, SAM B. JEFFRIES, Assistant Attorney-General, and T. D. HINES, for the State.

(1) Even if defendant's counsel had excepted to the instructions at the time they were given, the same was not mentioned in the motion for new trial, and, therefore, are

not before this court for review. State v. Jewel, 90 Mo. 471. (2) The denial of an application for change of venue by the trial court will not be disturbed in the absence of a showing that there was a palpable abuse of discretion. State v. Dyer, 139 Mo. 199. In this case there was a hearing and evidence upon both sides, and the court fairly decided the matter. There was evidence each way, but several of defendant's witnesses and all for the State on this question said at the time of the trial the defendant could get a fair and impartial trial in the county. The evidence showed if any prejudice ever existed it was confined almost exclusively to the locality where the crime was committed. In the very nature of things the trial court is a better judge of the necessity for change of venue, and has an advantage over this court in weighing the evidence as to prejudice of the inhabitants. State v. Holcomb, 84 Mo. 37; State v. Wilson, 85 Mo. 134.

GANTT, P. J.—The defendant was indicted, tried and convicted of murder in the first degree at the adjourned August term, 1898, of the circuit court of Cape Girardeau county. After unsuccessful motions for a new trial and in arrest of judgment he appeals to this court.

The evidence shows that the defendant had worked as a farm hand for the deceased, James Lail. Sometime in June, 1898, he was arrested for taking a horse and buggy belonging to some one (the record does not disclose whom), and appropriating it to his own use, and injuring the same, and was convicted of the misdemeanor, it seems. He was arrested at the house of Lail and taken away, and after he was at liberty again he returned to Lail's house. He found that Lail had employed one Brodarick in his place, and when he wanted to go to work again Lail stated to him that he had hired Brodarick and could not give him (Headrick) employment. Thereupon Lail and defendant settled up. The defendant had $2.10 coming to him, and deceased paid

him $1.10, and defendant directed deceased to leave the other dollar any time he wished at John Woods', in Jackson, Missouri. Defendant then got his clothes and left. Albert Summers and Miss Jessie Lail were present when the settlement was made. Summers testified that he knew Headrick, and that he had seen him with a pistol—38 calibre—and that on the day of the settlement at the back door of the house of Lail defendant exhibited the pistol to witness Summers, but made no threats to kill anyone; but after ·he settled with Lail and Mr. Lail had gone away, in the presence of Miss Jessie Lail and Summers, witness stated that the defendant said the next thing he would do they would all remember the balance of their lives, or words to that effect. Defendant and witness Summers then left together, and walked away from the Lail homestead; and witness Summers testified that defendant said he was going to take morphine and kill himself if he did not get work soon, and exhibited a bottle labeled "morphine" to witness. It seems defendant was raised about three miles from the Lail homestead, and that he had been living with his mother and stepfather, and that he had formed an attachment for Miss Lail, and that he talked to various persons about Kirksey and Miss Jessie Lail being sweethearts, and wanted at least two different young men of the neighborhood to assist him in breaking up the relation of lovers between Miss Lail and Kirksey; but each of the young men declined to do so.

The evidence showed that defendant was loafing around the town of Jackson, two and a half or three miles from the Lail homestead, and about three-quarters of a mile or a mile from where defendant lived, most of the time from the day he and Summers were at Lail's up to the time of the killing. The evidence was conflicting as to whether or not Miss Jessie Lail met and conversed with the defendant on the streets of Jackson just prior to the killing. She denied it, and the defendant asserted that she did, while disinterested persons.

who saw them on the street about the same time said that Miss Jessie was with another girl, and got in the buggy and was preparing to drive away when John Headrick, the defendant, simply walked up to the buggy, spoke to the girls and they drove off.

Before the tragedy defendant went to a physician in Jackson and sought medical attention for a disease he had contracted, and asked if some one else, not naming the person, could also use the medicine he procured.

On the morning of July 1, 1898, about 6 o'clock, according to the testimony of Mrs. Lail and Miss Jessie Lail, these two ladies were near their barn at the Lail homestead milking the cows and James M. Lail, the deceased husband and father, came from the house to the place where they were milking and sat down near them and talked with them, and when they had completed milking and started towards the spring house, which was on the other side of the fence from where they were, deceased walked between them, laughing and talking until the barn was reached, when he turned into the hallway of the barn, which hallway was simply the ordinary opening in a country barn, with the barn proper on one side and the corn crib on the other, and the roof connecting the same; and the ladies—mother and daughter—went on to the spring to take care of the milk. Mrs. Lail and her daughter testified that after they left the father, and before they reached the spring house, they saw defendant in his shirt sleeves come walking from the road across the barn lot.    He did not pass them and they did not speak to him, nor he to them.    Mrs. Lail testified that just as she stepped her foot into the spring house she heard a shot, and turning and casting her eyes toward the barn, she saw her husband come running out of the hallway through the door at the north end of the barn, and the defendant pursuing him, firing at him as he ran.    That witness, Mrs. Lail, and her daughter started running toward the husband

and father, hallooing to defendant to stop shooting, and that just as they reached the fence and started to get over the deceased fell, and that defendant stopped at the feet of deceased and began loading his revolver; and before he completed loading it, Mrs. Lail had reached her husband's side and threw herself on his prostrate form, and that while in this position defendant shot at her twice—the one shot entering her back and the other missing her, by reason of the fact that her daughter struck the pistol up as the shot was fired. Mrs. Lail and her daughter testified, and the defendant admitted that he fired the remaining charges in his pistol into the body of the deceased after he was dead, and also that he then took the pistol and beat the mother over the head with it. He then made the girl go in front of him toward the house, and the mother arose and started to her mother-in-law's, Grandma Lail's, a quarter of a mile distant, and defendant seeing her, ran after her, overtook her and stabbed her three times on the arm and shoulder and cut her ear almost off, and then attempted to cut her throat, severely gashing it, and left her in the road unconscious. Defendant then returned to the house, and soon after Mrs. Lail regained consciousness and ran across the field to her mother-in-law's, where she was taken care of. Defendant went back to the house and made Miss Jessie Lail get some water, in which he washed his hands leisurely and walked away. He was seen leaving the premises and was looking back and seemed to be suspicious of somebody following him. The neighbors soon gathered, and the body of deceased was taken care of and search was made for defendant. The murder having occurred on July 1, on Friday, defendant was finally apprehended in the neighborhood on Sunday morning.

He admitted the killing, but claimed that he had gone back to the premises on Wednesday night before, at the request of Miss Jessie Lail, and had met her secretly, and

that he had been in hiding in the barn, and about the Lail homestead since Wednesday night, and that Miss Jessie Lail was furnishing him food, and was slipping out of the house at night and coming to see him. This was all denied by Miss Lail on the witness stand.

Defendant claimed that on the morning of the tragedy he was attempting to go back into the barn and get into the loft to secrete himself, and remain during the day, and admitted that he saw the ladies going to the spring house, and corroborated their testimony up to the time that he entered the barn. Then defendant testified that as he entered the hallway of the barn he saw James M. Lail, the deceased, and being afraid he would raise a row with him if he saw him, defendant slipped into the corn-crib on the east side of the hall, which had only one door in it, about three feet above the floor of the hallway, and that as he got into the crib the door of the crib creaked, and attracted the attention of Mr. Lail, and he came around and looked into the crib to discover what made the noise, and that he saw defendant, and began to abuse him, and that Lail had a curry comb and brush in his hands, and undertook to assault him with the curry comb, and when defendant drew back out of reach the deceased advanced and began to cry for his wife to bring the gun, in order that he might kill defendant, and that defendant then, being apprehensive of his life, fired and shot the deceased in his eye, and that deceased then turned and ran out of the hallway to the point where he was found lying, and that defendant followed him firing as the ladies described he did. He also admitted firing shots into the dead body of James Lail.

The indictment follows the most approved precedents and is entirely sufficient. The arraignment was regular.

I. The principal complaint is urged against the refusal of the circuit court to award defendant a change of venue. The record shows that at the November adjourned term the

defendant filed his own unsupported affidavit, alleged prejudice of the inhabitants of the county against him, and offered to supplement it by oral testimony. The court overruled this application and declined to hear the oral evidence offered to support it.

The act of 1895 (Laws of Missouri 1895, p. 162), provides that "the petition of the applicant for a change of venue shall set forth the facts or grounds upon which such change is sought, and such petition shall be supported by the affidavit of petitioner and the affidavit of at least two credible disinterested citizens of the county where said cause is pending, and the truth of the allegations thereof shall be proved, to the satisfaction of the court, by legal and competent evidence." Instead of complying with this statute by filing the affidavit of the two compurgators, defendant offered his own affidavit and proposed to support it by oral testimony.

Again and again we have ruled that the right to a change of venue is purely statutory and the party seeking it must comply with the substantial requirements of the statute. The word affidavit, *ex vi termini*, means an oath. reduced to writing. [1 Ency. Plead. and Prac. 309; 1 Am. and Eng. Ency. of Law (2 Ed.), 909, and cases cited.] No error was committed in holding this application insufficient under the statute. [State v. Lanahan, 144 Mo. 31; State v. Neiderer, 94 Mo. 79.] Moreover, no injury resulted from this ruling because defendant the next day filed the requisite supporting affidavits and renewed his application and the court gave him a full hearing as to the existence of the alleged prejudice. This second application was also overruled and this is made an additional ground for reversal. We have examined the evidence both on the part of the State and defendant, and find no evidence of abuse of discretion. What prejudice existed was entirely local and such,

and such only, as is to be found always among the relatives
and intimate friends of the deceased.

II.    Error is assigned in refusing an instruction asked
by defendant.    The motion for new trial contains no such
ground.    The trial court was not asked to set aside the ver-
dict on account of any error in the giving or refusing of
instructions, and unless this is done its action is not reviewa-
ble.    [State v. Gilmore, 110 Mo. 1.]    It appears, however,
that the circuit court gave a most liberal instruction covering
the law of self-defense, and there was no reason for giving
the instruction of defendant on that subject, even if it had
not been properly refused on other grounds.

III.    The only other error assigned is that the weight
of the evidence is against the verdict of the jury.    Refer-
ence to the statement of the evidence hereinbefore made
demonstrates beyond the cavil of a doubt that the defendant
deliberately premeditated and planned the murder of James
Lail; that he was lying in wait for his victim to come to his
barn to feed and curry his horses; that he began firing upon
the unsuspecting farmer, whose only means of defense were
the curry comb and brush; that Mr. Lail instantly fled and
that defendant pursued and shot him as he ran and em-
phasized his malignity by discharging all the loads of his
revolver into the prostrate form of the deceased after he
was dead.    Not content with the accomplishment of the
unprovoked and inexcusable murder of the husband and
father in the presence of and in spite of the pleadings of the
wife and daughter, he deliberately reloaded his revolver and
shot the devoted wife as she attempted to shield her hus-
band from further mutilation.

Every element of willful, deliberate and cruel murder
was overwhelmingly established by the testimony without
one fact to mitigate its atrocity and brutality.    The jury
could not have rendered any other verdict under the evi-
dence.

There being no error in the record the judgment is
affirmed and the sentence of the law is directed to be
executed.   SHERWOOD and BURGESS, JJ., concur.