GEORGE U. CROCKER & others *vs.* JUSTICES OF THE SUPERIOR COURT.

Suffolk.    November 17, 1910. — March 2, 1911.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Mandamus. Superior Court. Practice, Criminal,* Change of place of trial, Venue.

A judge of the Superior Court made an order denying motions of the defendants in a criminal case in the following words: " I refuse to hear the parties on the several motions of the defendants that the court order a trial of these indictments in some county other than the county of Suffolk believing that I have no jurisdiction to entertain or grant such motions." *Held,* that this order did not mean that the judge of the Superior Court had considered the subject matter of the motions and ruled as matter of law that that court had no jurisdiction of such motions, in which case the only remedy of the defendants would have been by exception or appeal under R. L. c. 219, §§ 32, 34, 35, but that the order

was a refusal to act at all upon the motions, and therefore that the defendants had a right to resort to the extraordinary remedy of mandamus to compel the justices of the Superior Court to exercise their judicial faculty and either to deny the motions as matter of law or to determine whether they ought to be granted.

The Superior Court as created by St. 1859, c. 196, possessed, as to the subjects within its original jurisdiction, the powers which the Court of Kings Bench, the Court of Common Pleas and the Court of Exchequer had at common law in England in 1699, and such as had become a part of our body of common law before our separation from England, as well as those powers expressly conferred upon it by statute.

It is within the jurisdiction of the Superior Court to order a change of the place of trial of a person charged with a felony from one county to another, when satisfied that a fair and impartial trial cannot be had within the county where the venue is laid in the indictment.

When it is plainly shown that an impartial trial of a person indicted for a crime cannot be had in the county where the venue is laid in the indictment, a record should be made of that fact, and an order should be made transferring the case for trial to another county at a regular sitting of the court there; but the indictment remains unaltered as to venue, and all proceedings upon the indictment except the trial by jury should be in the county where the indictment was found.

The power of the Superior Court to order a change of the place of trial in a criminal case from one county to another is one which should be exercised with great caution and only after a solid foundation of fact has been established showing that the ends of justice require such a change.

RUGG, J.  The petitioners were indicted for a felony. Seasonably they presented motions, suggesting that because of "local prejudice and other causes" they could not have an impartial trial in the county of Suffolk, and asking that the proceeding be removed to another county for trial.  Thereafter, an order was entered by a judge of the Superior Court,* which as amended was as follows: "I refuse to hear the parties on the several motions of the defendants that the court order a trial of these indictments in some county other than the county of Suffolk, believing that I have no jurisdiction to entertain or to grant such motions."  This is a petition for a writ of mandamus to compel the Superior Court to entertain and decide the motions.†

The first question presented is whether mandamus lies in a case of this sort.  It becomes necessary to determine the meaning of the indorsement made in the Superior Court upon the

---

* *Wait,* J.

† The case came before *Rugg,* J., who ordered that the petition be dismissed, and, at the request of the petitioners and with the consent of the respondents, reserved the case for determination by the full court.

motions filed by the defendants, there, who are the petitioners here. It is perhaps susceptible of two constructions, one that the court has considered the subject matter, and ruled as matter of law that it has no jurisdiction of such motions, the other that the court has abdicated its province and refused to exercise its judicial function, adding by way of parenthesis that its excuse is a belief that it has no jurisdiction in the premises. Ordinarily we should be loath to adopt the latter construction. But the language appears to be strongly phrased with an evident intent to convey that thought, and an examination of the papers discloses that, as originally entered, an unequivocal ruling of law was made disposing of the motion. If that had stood as the final action of the Superior Court, the only remedy of the defendants would have been by exception or appeal under R. L. c. 219, §§ 32, 34, 35. But it did not so stand, and the action of that court was changed to a statement of declination even to hear the parties. We are constrained therefore to interpret the order as a refusal to act at all upon the motions.

The writ of mandamus is an extraordinary remedy, and is usually granted only when no other adequate relief can be afforded. It cannot be employed to supersede an appeal or exceptions in ordinary cases, and does not lie to review a final judgment. Proceedings of inferior tribunals within their jurisdiction in the exercise of the power confided in them cannot be revised in this way. It does not lie to correct errors committed in the course of trial, even though there be no remedy by exception or appeal. *Selectmen of Gardner* v. *Templeton Street Railway,* 184 Mass. 294, 297. *Finlay* v. *Boston,* 196 Mass. 267, 270. *McCarthy* v. *Street Commissioners,* 188 Mass. 338. *In re Key,* 189 U. S. 84.

But one of the ancient offices of this writ was to compel action by lower judicial tribunals respecting matters properly before them and within their jurisdiction. If such courts decline to exercise their judicature or to decide matters pending before them, mandamus has always been regarded as the appropriate means by which to set in motion their jurisdictional power. It lies to compel the performance of whatever appertains to the duty of lower courts, where there has been for any reason a refusal to act. Its agency in cases of this class is confined to set-

ting in motion the judicial activities so that a decision will be reached, but it does not extend to any direction as to what that decision ought to be. *Chase* v. *Blackstone Canal Co.* 10 Pick. 244. *Rice* v. *Commissioners of Highways,* 13 Pick. 225. *Morse, petitioner,* 18 Pick. 443. *Carpenter* v. *County Commissioners,* 21 Pick. 258. *Smith* v. *Boston,* 1 Gray, 72. See also *In re Winn,* 213 U. S. 458; *Parker, petitioner,* 131 U. S. 221; *Ex parte Harding,* 219 U. S. 363, 371; *Rex* v. *Stepney Corp.* [1902] 1 K. B. 317, 321.

It was the plain duty of the justices of the Superior Court to consider and exercise their judicial faculty upon the subject matter presented by the motions filed in that court, and either overrule them as matter of law or determine whether they ought to be granted. *French* v. *Jones,* 191 Mass. 522. *Cheney* v. *Barker,* 198 Mass. 356. As we construe the indorsement of the Superior Court upon the motions to be a mere refusal to act, and not the expression of any opinion or ruling, the provisions of R. L. c. 219, §§ 32, 35, authorizing an aggrieved defendant in a criminal case to appeal from a judgment of the Superior Court founded upon matter of law apparent upon the record and to allege exceptions to an opinion, ruling, direction or judgment upon any question of law, do not apply, and there appears to be no other adequate remedy open to the petitioners except this petition.

The issuance of the writ of mandamus is rarely, if ever, matter of right, and commonly rests in the sound judicial discretion of the court. It becomes necessary to determine whether the Superior Court in fact does have jurisdiction to entertain and decide the motions, for the reason that the writ ought not to issue when it can subserve no useful purpose to the petitioners.

The question to be determined is whether the Superior Court has jurisdiction to order a change of the place of trial from one county to another, if and when satisfied that a fair and impartial trial cannot be had within the county where the venue is laid in the indictment. This inquiry has never before been expressly presented for consideration and determination in this Commonwealth. " But this, so far from affording a reason why it should not be fully examined, rather requires that it should be consid-

ered with great care and attention, as establishing an important precedent." *Washburn* v. *Phillips*, 2 Met. 296, at 297. It is not covered by the terms of any statute, although certain relevant statutes will be referred to hereafter. The decision must rest upon the general common law power of the court. It can be determined only upon consideration of the powers of courts of general jurisdiction at common law and of our own courts in the Colony and Province of Massachusetts Bay and under the Constitution.

It is essential first to examine the powers possessed and exercised by the courts of common law in England before the emigration of those who first settled this Commonwealth and brought with them as a part of their heritage the common law as it existed in England. We resort to a consideration of the common law of England previous to the grant of the Provincial Charter in 1691, because as was said in *Commonwealth* v. *Knowlton*, 2 Mass. 530, at 534, 535: "Our ancestors, when they came into this new world, claimed the common law as their birthright, and brought it with them, except such parts as were judged inapplicable to their new state and condition. The common law, thus claimed, was the common law of their native country, as it was amended or altered by English statutes in force at the time of their emigration. Those statutes were never re-enacted in this country, but were considered as incorporated into the common law. Some few other English statutes, passed since the emigration, were adopted by our courts, and now have the authority of law derived from long practice. . . . So much, therefore, of the common law of England, as our ancestors brought with them, and of the statutes then in force, amending or altering it, — such of the more recent statutes as have been since adopted in practice, — and the ancient usages aforesaid, — may be considered as forming the body of the common law of Massachusetts, which has submitted to some alterations by the acts of the Provincial and State Legislatures, and by the provisions of our constitution." This language was quoted with approval in *Sackett* v. *Sackett*, 8 Pick. 309, 316. *Commonwealth* v. *Leach*, 1 Mass. 59, 61. *Phillips* v. *Blatchford*, 137 Mass. 510, 513. This always has been the unquestioned law of the Commonwealth. The system of reporting decisions of the higher courts previous to the main emi-

gration to this country between 1620 and 1640 and before the granting of the second charter in 1691 and up to the Declaration of Independence was not so perfect as now, and, in order to ascertain what was the common law then and before the revolution, it is profitable and permissible to examine decisions of English courts since that date, not as binding authorities but as strongly persuasive of what the common law was, because they are determinations by men of experience and learning who have continued to live in the atmosphere of the home of the common law, seeking to expound its principles under the heavy responsibilities of a judicial office.

It was the common law that the indictment for a crime must be found and tried in the county where it occurred, and ordinarily this principle was applied with great strictness.   Nevertheless in an early decision, *Farewether's case,* Cro. Car. I. 348, decided in 1634, during a discussion as to the place of the trial, the clerk of the crown is reported to have said, " That divers precedents have been of such trials upon indictments *in banco* without any consent of the parties, and against the will of the prosecutors, and in more remote counties." The first trace of the practice, which we have been able to find, was in 1351 and is referred to in 1 Pike's History of Crime in England, 479, in these words :  " An instance in which accused persons were to be tried at the Gaol Delivery of Newgate, because they were too powerful in their own district, appears on the Gaol Delivery Roll, 25 Edward III., Huntingdon, where there is a writ to that effect, directed to the Sheriff of Cambridge." In *Sacheverell's case,* 10 How. St. Tr. 30, decided in 1684, jurymen were drawn from the county of Kent, although the crime prosecuted occurred in the county of Nottingham.   In *The King* v. *County of Nottingham,* 2 Lev. 112, decided in 1675, trial was had in a county other than that where the offense was alleged to have been committed.   In *The Queen* v. *County of Wilts,* 6 Mod. 307, [in 1705] Chief Justice Holt is reported to have said that " for the necessity of an indifferent trial " removal might be had into an adjacent county.   To the same effect *Sir Samuel Gerard's case,* Salk. 670 [1705].   See also *French* v. *Kent,* Ld. Raym. 33 [1662]; *Earl of Shaftsbury* v. *Cradock,* 1 Vent. 363 [1683]; *Anonymous,* 1 Vent. 61 [1771].   In *Rex* v. *Cowle,* 2 Burr.

834, 859 [in 1759], Lord Mansfield said, "The law is clear and uniform, as far back as it can be traced. . . . So in parts of England itself where an impartial trial cannot be had in the proper county, it shall be tried in the next; as 5 G. I. *Rex* v. *County of the City of Norwich*, [1 Stra. 177, decided in 1718] about the county bridge, the trial was in Suffolk." In *Rex* v. *Harris*, 3 Burr. 1330 [in 1762], the same eminent judge said by way of dictum at p. 1333, " Notwithstanding the locality of some sorts of actions, or of informations for misdemeanors, if the matter cannot be tried at all, or cannot be fairly and impartially tried in the proper county, it shall be tried in the next adjoining county." In the same case Mr. Justice Wilmot said that when it " plainly appears that a fair and impartial trial cannot be had " he had no doubt of the court's power to grant a removal for trial. In *The Queen* v. *Palmer*, 5 El. & Bl. 1024, Lord Campbell in granting a petition for removal to another county on the ground that an impartial trial could not be had in the county where the indictment was laid, in forcible language asserted the jurisdiction of the court to pass upon such a motion. In *The Queen* v. *Conway*, 7 Ir. C. L. 507, the question was fully discussed, and all the judges appear to have agreed as to the power of the court, Crampton, J., saying at p. 525 : " There is another common law right, equally open to defendants and prosecutors, . . . that where it appears that either party cannot obtain a fair and impartial trial in the proper county, then this court . . . has jurisdiction to take the case out of the proper county, as it is called, and to bring it into an indifferent county. . . . This jurisdiction to change the venue . . . has been exercised by this court from a very early period. We have reported cases, where the doctrine is laid down in emphatic language; we have the practice of the court of Queens Bench in England independently, of any practice of our own court. . . . The general jurisdiction of the court, in a proper case, to change the venue from one county to any other, cannot be the subject of doubt."

In *The King* v. *Holden*, 5 B. & Ad. 347, Lord Denman said : " I apprehend that the power of changing the place of trial whenever it is necessary for the purpose of securing, as far as possible, a fair investigation, is a part of the jurisdiction of this court;

and that that power may be exercised, where it is absolutely necessary, in cases of felony." In *The King* v. *County of Cumberland*, 6 T. R. 194, 195 [1795], it was said by Lord Chief Justice Kenyon that it " would be an anomalous case in the law of England " if the Court of Kings Bench did not have power to order a cause removed for trial to a county where a disinterested jury might be had. In *Regina* v. *Barrett*, Ir. Rep. 4 C. L. 285, the opinion fully reviews the authorities and concludes that they " show that the jurisdiction to change the place of trial in cases of felony does exist." The power was asserted plainly to exist by two lords chancellors, Lord Cranworth and Lord Campbell, and by the Attorney General and others in debate in the House of Lords. See 140 Hansard's Parliamentary Debates, (3d series) 218, 512, 2194, 2200. Statements of similar import are found in *Proctor* v. *Philips*, Hardres [in 1663], 311 ; *Anonymous*, Dyer, 279 b ; *Crouch* v. *Risden*, 1 Vent. 61 (in 1671); *Mayor of Bristol* v. *Procter*, 1 Wils. 298. See also *Rex* v. *Clace*, 4 Burr. 2456 ; *The King* v. *Amery*, 1 T. R. 363; *The Queen* v. *Fay*, Ir. Rep. 6 C. L. 436 ; *The Queen* v. *Delme*, 10 Mod. 199 ; *The King* v. *Hunt*, 3 B. & Ald. 444; *Rex* v. *Ellis*, 6 B. & C. 145; *The King* v. *Thomas*, 4 M. & S. 442; *Regina* v. *Simpson*, 5 Jur. 462; *Anonymous*, Lofft, 50; *Poole* v. *Bennett*, 2 Stra. 874 ; *Anonymous*, 12 Mod. 503 ; *The King* v. *Nottingham*, 4 East, 208; *The King* v. *Russell*, 4 B. & Ad. 576 ; *The Queen* v. *Phelan*, 14 Cox C. C. 579 ; Tidd's Practice, 605; Lush's Practice, 409; Short & Mellor's Criminal Offences, 204, 205.

Some of these decisions were made upon a petition for a writ of certiorari from the Court of Kings Bench to a lower court. The form of action, however, does not seem to be material. It is the general recognition of a power of removal for the purpose of securing a fair trial which is important. It is asserted in 1 Chit. Crim. Law, (2d ed.) 201, 371, 494, that it has long been the common law of England that, when an impartial trial cannot be obtained, the Court of Kings Bench has the power of directing the trial to take place in the next adjoining county. We are able to find no dissent from this apparently universal current of authority asserting that the Court of Kings Bench in England possessed the power. This review of authorities demonstrates that in 1699 the Court of Kings Bench in England had and in

fact exercised the jurisdiction to remove causes from one county to another in order to secure an impartial trial.

It remains to ascertain whether this right of removal for a fair trial was a part of the common law brought over by the forefathers. By the Prov. Laws, 1699, c. 3, § 1 (Acts and Resolves of the Province of Massachusetts Bay, vol. I. p. 371), it was enacted, " That there shall be a superiour court of judicature, court of assize and general goal delivery, over this whole province . . . who shall have cognizance of all pleas, real, personal or mixt, as well all pleas of the crown and all matters relating to the conservation of the peace and punishment of offenders as civil causes or actions between party and party . . . and generally of all other matters, as fully and amply to all intents and purposes whatsoever as the courts of king's bench, common pleas and exchequer within his majesty's kingdom of England have or ought to have." This statute has frequently been referred to as a source of jurisdiction of the courts of this Commonwealth. *Savage* v. *Gulliver*, 4 Mass. 172,174. *Commonwealth* v. *Johnson*, 8 Mass. 88. *Commonwealth* v. *Parker*, 2 Pick. 550, 555. *Washburn* v. *Phillips*, 2 Met. 297. *Fuller* v. *Starbuck*, 5 Cush. 493. *Attorney General* v. *Boston*, 123 Mass. 460, 471. *Connecticut River Railroad* v. *County Commissioners*, 127 Mass. 50, 58. Chapter 1 of the Province Laws of 1699 (Acts and Resolves of the Province of Massachusetts Bay, vol. I. p. 367) established a court of general sessions of the peace to be held by the justices of the peace of each county with a limited criminal jurisdiction but an unlimited right of appeal to the court of assize and general gaol delivery. It is not necessary to inquire, therefore, whether the Superior Court of Judicature had power to remove causes from the court of general sessions by writ of *certiorari* (see *Cook, petitioner*, 15 Pick. 234; *Commonwealth* v. *Roby*, 12 Pick. 496, 498), for all cases plainly could be brought before it on appeal. As the express terms of the statute conferred upon the Superior Court of Judicature all the jurisdiction possessed by the Court of Kings Bench in England, the right to grant removal to another county, in order that a fair trial might be had, seems to have been given it. It is plain, from the terms of this statute and what appears to have been the undisputed practice in England prior to 1699, that the Superior Court of Judi-

cature possessed this right in 1699. Nothing can be found in the provincial statutes passed between 1699 and 1780 which curtailed or limited the jurisdiction conferred by the act by which the court was constituted.

When the Constitution of Massachusetts was adopted in 1780, c. 6, art. 6, provided that " All the laws which have heretofore been adopted, used and approved, in the Province, Colony or State of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force, until altered or repealed by the Legislature; such parts only excepted as are repugnant to the rights and liberties contained in this Constitution." The general body of jurisprudence which had heretofore existed was thus preserved and continued. By St. 1780, c. 17, an act approved February 20, 1781, the jurisdiction of the Supreme Judicial Court was defined to be the same as " By particular laws were made cognizable by the late Superior Court of Judicature, Court of Assize and General Gaol Delivery, unless where the Constitution and Frame of government hath provided otherwise." An examination of statutes passed since respecting the jurisdiction of courts shows that the Legislature has manifested no intention, either expressly or by fair implication, to limit in this respect the powers of the higher courts as established by the Constitution and the legislation passed immediately thereafter. See St. 1782, c. 9. St. 1782, cc. 11 and 14, respectively, establishing a court of common pleas for the trial of civil causes and a court of General Sessions of the Peace for the trial of criminal causes both gave full right of appeal to the Supreme Judicial Court, and no substantial change was made by St. 1803, c. 154, which transferred to the court of common pleas the criminal jurisdiction of the court of General Sessions of the Peace. See also Rev. Sts. cc. 81, 82. When the Superior Court was established by St. 1859, c. 196, section 1 provided that it should " have the same powers and jurisdiction in all actions and proceedings at law, whether civil or criminal, as the Supreme Judicial Court, the Court of Common Pleas, the Superior Court of the county of Suffolk, and the Municipal Court of the City of Boston now have," with exceptions not here material. This statute conferred upon the Superior Court powers of general jurisdiction theretofore exercised by the Superior Court of Ju-

dicature and by the Supreme Judicial Court. The Superior Court became thereby a court of general criminal jurisdiction impliedly clothed as to matters placed within its original cognizance, with all those inherent attributes which the Supreme Judicial Court would have possessed as to the same matters. Speaking broadly, it possessed, as to the subjects within its original jurisdiction, the powers which courts of Kings Bench, Common Pleas and Exchequer had at common law in England before 1699, and such as had become a part of our body of common law before our separation from England, as well as those expressly conferred upon it by statute.

It is true that there are dicta in early cases to the effect that such power did not exist. In *Lincoln County* v. *Prince*, 2 Mass. 544, it was said in a *per curiam* opinion upon a plea in abatement in an action brought by a county against a citizen of another county where a statute authorized such action in the court of the county of the defendant's domicil, after discussing some other matters not directly involved, that " All these difficulties would be removed by investing this court with power to adjourn any cause, from a county where an impartial trial cannot be had, to an adjoining county, for a trial by disinterested and unexceptionable jurors. This power we do not possess." There was nothing before the court involving this question, however. The force of the decision on the point decided was somewhat limited in *Gage* v. *Gannet*, 10 Mass. 176. *Hawkes* v. *Kennebeck*, 7 Mass. 461, was also an action against a county which went to the full court only on a plea in abatement as to the teste of the writ, and in an opinion directing the writ to be quashed Chief Justice Parsons in the course of the reasoning said by way of dictum : " If this court had a power, which it has not, of ordering an action commenced in one county to be tried in another, when impartial justice required it," and " that every action must, in this State, be tried in the county in which it is commenced." It is also to be noted that these dicta were spoken concerning causes commenced in the Court of Common Pleas, which was a distinct and separate court established for each county, composed of four judges, all of whom were required by law to be residents of the county for which they were appointed. See St. 1782, c. 11. It may be that as to causes arising in a court of that kind the power

of the appellate court was thought to be restricted beyond what it would have been over a cause begun in a court of such general jurisdiction as the Superior Court is.   See *Hall* v. *Hall,* 200 Mass. 194.   The court expressly declined to follow the general reasoning of this opinion, though this particular point was not adverted to in *Brown* v. *Somerset,* 11 Mass. 221.   The statement in *Cleveland* v. *Welsh,* 4 Mass. 591, that " no power was given to the court to change the venue to the county where the cause of action happened " was made as to the power of the Court of Common Pleas of that time, a distinctly county court of somewhat limited jurisdiction, and possessing therefore only those functions expressly or by necessary implication granted to it, and did not refer to removal to another county to secure an impartial trial.

These are the only cases in this Commonwealth in which there is any reference to the subject.   While dicta even of such a character are entitled to respect, they are not of binding authority, and uttered as these were without any apparent investigation respecting a question involving considerable historical research which fortunately has rarely arisen here, they are not to be regarded as of controlling significance.

Special Provincial laws were passed making provision for a change in the usual course of trial in particular cases.   See St. 1712–1713, c. 7 (1 Prov. Laws, 701) setting forth in its preamble a complaint by " divers Indian sachems " on Nantucket that they could not secure fair trials in the usual courts.   St. 1744–1745, c. 8 (3 Prov. Laws, 156).   Jonathan Belcher, who had been Governor of the Province from 1730 to 1741, petitioned that a cause in which he was interested pending in Bristol County might be removed to another county because of local interest, but the Legislature directed the summoning of jurors from the county of Suffolk to attend at Taunton in the county of Bristol.   Res. 1747–1748, cc. 138, 278; 1749–1750, c. 353; 1750–1751, cc. 7, 91 (14 Prov. Laws, 55, 111, 402, 411, 445).   Similar action was taken in behalf of Ebenezer Salisbury, who had an action pending as to the same subject matter as Governor Belcher.   Res. 1750–1751, c. 293 (14 Prov. Laws, 525).   See also Joseph Buckminster's case, Res. 1742–1743 (13 Prov. Laws, 142), and that of Timothy Prout, Res. 1752–1753, c. 47 (14 Prov. Laws, 648).

Numerous other statutes have been referred to by the learned

district attorney, in his very exhaustive and helpful brief, providing for trial in other counties than that laid in the indictment, because of the desirability of an earlier trial than otherwise could have been had, or for some reason other than that an impartial trial could not be had.   All these Provincial statutes are of little consequence in this connection for the reason that the Province was small and the legislative body exercised a broad power except as controlled by the authority of the king and his representative in the royal governor.   It was in some respects more easy of access than the Superior Court of Judicature because it was more often in session and the court had little power in vacation, and in some counties met but once a year, while the Legislature met twice a year or oftener.   Hence it was natural to apply directly to it in unusual cases rather than await a regular sitting of the court.

Since the adoption of the Constitution, several statutes have been passed enlarging the venue of actions, in order to secure trials before indifferent jurors in actions for the most part though not exclusively to which the counties, the city of Boston (which constitutes by far the larger part of Suffolk County in population, wealth and area), the town of Nantucket, the towns of Dukes County and the Commonwealth are parties.   Sts. 1810, c. 127; 1866, c. 233; 1879, c. 255; 1877, c. 234, § 5; 1808, c. 19; 1816, c. 103; 1828, c. 13; 1885, c. 384, § 14.   R. L. c. 167, §§ 4–6, 8, 9.   Sts. 1904, c. 320; 1910, c. 63.   Other statutes have permitted or directed trials of causes arising in one county to take place in another.   St. 1871, c. 240, § 1, authorized a change in capital cases upon the petition of the defendant whenever in the opinion of the court an impartial trial could not be had in the county where the cause was pending.   R. L. c. 157, §§ 12–15. St. 1887, c. 347, gave similar power to the Supreme Judicial and Superior Courts in all civil causes to be exercised upon application of either party.   R. L. c. 167, § 12.   Thus by express enactment the Legislature had conferred the power upon the higher courts as to all causes except crimes less than capital.   In the light of the history of our common law and the jurisdiction of our courts, we are of opinion that these statutes, so far as they empower a transfer in order to secure an impartial trial, are but declaratory of the common law and confer no new power.   A

careful examination will show that statutes not infrequently have been enacted which only declare the common law.   For example, *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538.   These statutes and this principle for securing an impartial trial in exceptional cases are in no way at variance with the general proposition of art. 13 of the Declaration of Rights as to the importance of the verification of facts in the vicinity where they happen.

The weight of opinion in those of the older States, whose judicial history is most nearly like our own, supports the view that it is an inherent power of common law courts to order a change for the purpose of securing an impartial trial.   *Cochecho Railroad* v. *Farrington*, 26 N. H. 428 at 436, held that the power of the courts of England to transfer the trial of transitory actions " became thoroughly engrafted upon the common law, long before the independence of this country; and from that time forth, not only has the practice prevailed in the courts of England, but the power is now exercised by the courts of very many if not all of our States, either by force of express statute or the adoption of the common law into the jurisprudence of the same." *State* v. *Albee*, 61 N. H. 423, involved the precise question here presented.   It arose under a constitution which provided that "In criminal prosecutions, the trial of facts in the vicinity where they happen is so essential to the security of the life, liberty, and estate of the citizen, that no crime or offense ought to be tried in any other county than that in which it is committed, except in cases of general insurrection in any particular county, when it shall appear to the judges of the Superior Court that an impartial trial cannot be had in the county where the offense may be committed, and, upon the report, the Legislature shall think proper to direct the trial in the nearest county in which an impartial trial can be obtained."   By act of 1692 the Superior Court of New Hampshire was given the jurisdiction of the English Court of Kings Bench.   Yet notwithstanding the language of the Constitution, it was held that the court possessed common law power to change the place of trial of a criminal cause in order to secure an impartial trial in the absence of any statute, it being said in the opinion: "Occasions sometimes occur when from a combination of circumstances popular prejudices are aroused, and bitterness of feeling fills the popular mind.   Jurors, because they

are human, may be swayed by an unjust public sentiment, and may be influenced by public prejudices.    It is not reasonable to suppose that the convention that formed the constitution of 1784 understood that such a state of popular feeling could only arise during a time of general insurrection, or intended that an accused citizen should be subjected to the expense, delay, and annoyance of procuring the legislative sanction to a change of venue, and that only after a report of the judges of the Superior Court. Men who had enjoyed this protection under the British crown would not be likely to surrender it after engaging in an exhaustive war for seven years to establish their independence. One of their grievances was the trampling under foot of the time-honored principle that trials for crime must be by a jury of the vicinage."    This case overrules whatever may be inconsistent with it in the earlier case of _State_ v. _Sawyer_, 56 N. H. 175, which was a _per curiam_ opinion.

In _Commonwealth_ v. _Balph_, 111 Penn. St. 365, where the same question in principle was under consideration, it was held that the court had power to transfer a cause to secure an impartial trial, and after citing some of the English cases to which we have referred it was said: " This is the settled law of England, and in this country, in those States in which the Supreme Court is clothed with Kings Bench powers the same rule prevails." To the same effect see _Commonwealth_ v. _Delamater_, 145 Penn. St. 210 ; _Commonwealth_ v. _Smith_, 185 Penn. St. 553, 565; _Quay's petition_, 189 Penn. St. 517, 540, 541; _Commonwealth_ v. _Ronemus_, 205 Penn. St. 420, 424.    In _Negro Jerry_ v. _Townshend_, 2 Md. 274, at 278, it was said: " All laws for the removal of causes from one vicinage to another, were passed for the purpose of promoting the ends of justice, by getting rid of the influence of some local prejudice which might be supposed to operate detrimentally to the interests and rights of one or the other of the parties to the suit.    This is a common law right belonging to our courts, and as such can be exercised by them in all cases, when not modified or controlled by our constitutional or statutory enactments."    _Price_ v. _State_, 8 Gill, 295, 310 _et seq._

It was held in _People_ v. _Peterson_, 93 Mich. 27, 28, 31, that, although there was a statute dealing with the subject, the statute was " but declaratory of the common law power vested in

the Circuit Courts of this State." This was followed in *People* v. *Fuhrmann*, 103 Mich. 593, 595, and *Glazier* v. *Ingham Circuit Judge*, 153 Mich. 481; 485. These cases must be regarded as overruling whatever there is to the contrary in *Shannon* v. *Smith*, 31 Mich. 451.

The same view is held in New York, where in *Jones* v. *People*, 79 N. Y. 45, 49, it was said that the power was inherited from the English Court of Kings Bench. *People* v. *McLaughlin*, 150 N. Y. 365, 375. *People* v. *Vermilyea*, 7 Cowen, 108, 130, 139. *People* v. *Webb*, 1 Hill, 179, 182. *People* v. *Bodine*, 7 Hill, 147. *People* v. *Jackson*, 114 App. Div. (N. Y.) 697. The same rule prevails in Minnesota, where it was said that a statute to that effect was merely declaratory of the common law. *State* v. *Miller*, 15 Minn. 344, 349. In a well considered opinion reviewing somewhat the authorities, the same conclusion was reached in *Barry* v. *Traux*, 13 No. Dak. 131, 137–148.

In *Kendrick* v. *State*, Cooke, (Tenn.) 474, and *Bob* v. *State*, 2 Yerg. 173, 183, it was held that a removal should be granted under common law powers where a cause was made out that "because of the public clamor, justice could not, in all likelihood be done the person charged in the county where charged." It may be inferred from *Weakley* v. *Pearce*, 5 Heisk. 401, 414–423, arising after the adoption of a new constitution in Tennessee, that these older cases do not declare the present practice in that State, probably on the ground that the whole subject has been covered and minutely regulated by statute. See also *Ex parte Williams*, 4 Yerg. 579.

There are authorities collected in a footnote * which seem to

---

* *Adams* v. *People*, 12 Ill. App. 380, 382. *Millison* v. *Holmes*, 1 Ind. 45, 46. *State* v. *Smith*, 55 Ind. 385, 386. *Weakley* v. *Wolf*, 148 Ind. 208, 219–221. *In re Griffin*, 33 Ind. App. 153, 154. *In re Darrow*, 83 N. E. Rep. (Ind.) 1026. *Meunch* v. *Breitenbach*, 41 Iowa, 527, 529. *Zelle* v. *McHenry*, 51 Iowa, 572, 575. *Lightfoot* v. *Commonwealth*, 80 Ky. 516, 523. *Byram* v. *Holliday*, 84 Ky. 18, 21, 22. *Powers* v. *Mitchell*, 75 Maine, 364, 369. *Wilson* v. *Rodewald*, 49 Miss. 506, 511, 512. *Wessinger* v. *Mausur & Tibbetts Improvement Co.* 75 Miss. 64, 71. *Wilkerson* v. *Jenkins*, 77 Miss. 603, 606. *State* v. *Sanders*, 106 Mo. 188, 194. *State* v. *Wofford*, 119 Mo. 408, 410. *State* v. *Dyer*, 139 Mo. 199, 209. *State* v. *Lanahan*, 144 Mo. 31, 38. *State* v. *Headrick*, 149 Mo. 396, 403. *Raming* v. *Metropolitan Street Railway*, 157 Mo. 477, 487. *State* v. *Barrington*, 198 Mo. 23, 84. *State* v. *McGehan*, 27 Ohio St. 280, 284. *Stanley* v. *United States*, 1 Okl. 336, 340–342. *Commercial National Bank* v. *Davidson*, 18 Ore.

have a contrary appearance.   It is not necessary to examine them one by one.   Most of them are to be distinguished as arising under constitutions which have some controlling provision, or under statutes or codes which cover the whole subject matter of change of place of trial in great detail and leave nothing to be governed by the common law.   *Doyle* v. *Kirby*, 184 Mass. 409, 411.   *Attorney General* v. *New York, New Haven, & Hartford Railroad*, 197 Mass. 194, and cases cited.   Almost without exception also they are by courts whose history does not extend through a Provincial and Colonial period, and whose jurisdiction is not the inheritance of so close a connection by statutory reference and by the adoption and growth of custom to the court of England as in this Commonwealth.   It is perhaps true of the newer States that the powers of courts even of general jurisdiction are more technically dependent upon the terms of statutes than in States where the development of jurisdiction has been more slow and wrought in part only by detailed enactments and in part by reference to the powers of the common law courts of England.   Moreover, no one of them discusses the question fully and comprehensively in its broader aspects.   For these reasons we do not regard these decisions as persuasive authority.

This review demonstrates that the great weight of authority supports the view that courts, which by statute or custom possess a jurisdiction like that of the Kings Bench before our revolution, have the right to change the place of trial, when justice requires it, to a county where an impartial trial may be had.

If the matter is considered on principle and apart from authority, the same conclusion is reached.   It is inconceivable that the people who had inherited the deeply cherished and hardly won principles of English liberty and who depleted their resources in a long and bloody war to maintain their rights as freemen, should have intended to deprive their courts of the power to secure to every citizen an impartial trial before an unprejudiced tribunal.   The people of the Commonwealth solemnly avowed in their Declaration of Rights, art. 29, that "It

57, 65, 66.   *Commonwealth* v. *Rolls*, 2 Va. Cas. 68.   *Commonwealth* v. *Wildy*, 2 Va. Cas. 69.   *Heath* v. *Mathiew*, 19 Wis. 114, 116.   *Boldt* v. *State*, 72 Wis. 7, 11.   *Hanley* v. *State*, 125 Wis. 396, 400.   *State* v. *Howard*, 31 Vt. 414.   *Cotton* v. *State*, 32 Texas, 614, 636–640.   *Johnson* v. *State*, 31 Tex. Cr. 456, 461.

is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial, and independent as the lot of humanity will admit." There can be no justice in a trial by jurors inflamed by passion, warped by prejudice, awed by violence, menaced by the virulence of public opinion or manifestly biased by any influences operating either openly or insidiously to such an extent as to poison the judgment and prevent the freedom of fair action. Justice cannot be assured in a trial where other considerations enter the minds of those who are to decide than the single desire to ascertain and declare the truth according to the law and the evidence. A court of general jurisdiction ought not to be left powerless under the law to do within reason all that the conditions of society and human nature permit to provide an unprejudiced panel for a jury trial. Without such a power it might become impossible to do justice either to the general public or to the individual defendant. Our system of government has created the executive, the legislative and the judicial, as three independent and co-ordinate departments, and in strong and comprehensive language has prohibited each from attempting to exercise the functions of either of the others "to the end that it may be a government of laws and not of men." The courts of general jurisdiction under such a Constitution have the inherent power to do whatever may be done under the general principles of jurisprudence to insure to the citizen a fair trial, whenever his life, liberty, property or character is at stake. The possession of such power involves its exercise as a duty whenever public or private interests require.

The purpose for which courts are established is to do justice. A fundamental principle of free institutions was stated by Hamilton in these words: "Justice is the end of government. It is the end of civil society. It ever has been, and ever will be pursued, until it be obtained or until liberty be lost in the pursuit. In a society, under the forms of which the stronger faction can readily unite and oppress the weaker, anarchy may as truly be said to reign, as in a state of nature where the weaker individual is not secured against the violence of the stronger."

(The Federalist, ed. 1864, No. 51, p. 401.)   Where questions of fact are to be settled as in all criminal prosecutions for felony, and in a large number of other causes, a jury is the instrumentality provided by the law for determining those facts.   Government itself fails if a jury of just men with minds open only to the truth as shown by the evidence cannot be provided.

Considerations based upon historical research, authority and sound principle lead to the conclusion that it was within the jurisdiction of the Superior Court to consider and grant the motions filed by the several petitioners here, defendants in that court, if upon investigation it was found that a trial before an indifferent jury could not be had in Suffolk County.   Such a motion is not technically for a change of venue, but only for a change as to the place of trial by jury.   Where a plain case is made out, a record should be made that an impartial trial cannot be had in the county where the indictment is laid, and the cause ordered transferred for trial to another county at a regular sitting of the court there.   The indictment remains unaltered as to venue, and all other proceedings upon it except the trial by jury should be in the county where the indictment is found.

That this question never has been presented for determination before is strong proof that there has been no occasion for the exercise of that power.   Such a motion ought not to be granted upon mere suggestion, nor unless the reason for it is fully established.   It is a jurisdiction which should be exercised with great caution and only after a solid foundation of fact has been first established.   Manifestly it should be resorted to only in aid of justice, and it should not be permitted to be employed as an instrument of obstruction or as a means of delay. But if the Superior Court is convinced that a fair trial cannot be had in any county where an indictment is found, it has the right and ought to order the cause removed to such near by county as will furnish a jury which would be impartial.

*Writ to issue.*

*C. F. Choate, Jr.*, (*H. F. Hurlburt* with him,) for the petitioners.

*J. C. Pelletier*, District Attorney, for the respondents, submitted a brief.