AMERICAN FIREWORKS COMPANY OF MASSACHUSETTS *vs.* WALTER MORRISON & others.

Suffolk.    December 8, 27, 1937. — June 28, 1938.

Present: FIELD, LUMMUS, QUA, & COX, JJ.

*Practice, Civil,* Report. *Frauds, Statute of. Contract,* What constitutes.

On a record of an action in the Superior Court not showing the surrounding circumstances, the granting of successive extensions of time for the filing of a draft report and of an affidavit of its presentation to the trial judge to a time more than two years after the trial and reservation of the action for report could not be said to be an abuse of discretion, nor was it beyond the judge's power to allow the report four years after such presentation to him.

Upon evidence that it was understood between a producer of a "fireworks spectacle," a fireworks corporation hired by him and a "sponsor" of the spectacle that the producer should be "eliminated" and be no longer responsible for the corporation's charges, and that the corpora-

tion continued to operate the spectacle in reliance on an oral promise to pay its charges then made by the "sponsor," such promise could be found to be an original undertaking by the "sponsor" and not one to answer for the producer's debt within the statute of frauds.

CONTRACT. Writ in the Superior Court dated February 7, 1927.

The action was tried before *Donnelly*, J., who ordered a verdict for the defendant and reported the case.

*E. M. Dangel*, (*L. E. Sherry* & *S. Andelman* with him,) for the plaintiff.

*J. J. Higgins*, (*R. R. Elliott* with him,) for the defendants.

QUA, J. This is an action of contract now being pressed against the defendants Morrison and Bolton only, hereinafter called the defendants, to recover for the "use of a Scenic Spectacle called 'America' and fireworks displays."

The record before us consists of a report by the trial judge and a bill of exceptions of the defendant Morrison, wherein the only exception shown to have been saved is "to the allowance of the report."

In logical sequence the bill of exceptions comes first. The ground of exception is alleged unreasonable and unconscionable delay which it is contended placed the final allowance of the report beyond the power of the trial judge. The pertinent facts, in so far as they appear, are these: On May 21, 1931, the judge directed a verdict for each defendant and "consented" to report the case under G. L. c. 231, § 111. Thereafter the times for filing the draft report and the affidavit of its presentation to the judge for his signature under the rules of the Superior Court (Common Law Rule 54 [1923], Rule 75 [1932]) were extended by successive extensions until after the filing of a draft report and by leave of the court of a substitute draft report and finally of the affidavit. The affidavit, as appears by the docket entries, was filed June 20, 1933. No further action appears to have been taken upon the report until the judge allowed it July 3, 1937. On June 17, 1933, each defendant filed a motion to vacate the reservation for report, "which the Court took under advisement but never acted upon." The substitute draft report was filed two days later, and

it does not appear whether any further effort was made to have the judge act upon the motions.

Such a record of repeated extensions and delays in the process of getting a case ready for this court is most unfortunate and can be justified only by very extraordinary circumstances. What the reasons may have been we do not know. The exceptions do not disclose what if any evidence was presented when the several extensions were allowed up to the filing of the affidavit of presentation to the judge on June 20, 1933. We cannot say as matter of law that allowing them was an abuse of discretion. After the presentation of the report to the judge the matter was in his hands. It then became his duty to act with such promptness as circumstances would permit. From then on the responsibility was his. He had the necessary power. He was not dependent upon the coöperation of counsel. After a draft report has been presented to him the judge can and should set a time for hearing upon it. If the party desiring the report fails to attend, the judge can vacate the reservation for report and refuse to report the case, thereby leaving it in position to become ripe for judgment. *Leland* v. *United Commercial Travelers*, 233 Mass. 558, 560–561. See *Frank, petitioner*, 213 Mass. 194. Or he can settle the report in the party's absence. If the opposing party fails to attend, the judge can settle the report in his absence. In the event of the judge's refusal to take any action or of unreasonable delay in acting, he can be compelled to exercise his judicial function. *Crocker* v. *Justices of the Superior Court*, 208 Mass. 162.

The present question is simply whether the judge had power to allow the report so long after the trial. G. L. (Ter. Ed.) c. 231, § 111, providing for reports, mentions no limit of time, although it has been said that the time must be "within reason." *Brown* v. *Grow*, 249 Mass. 495. The time in this case goes to the verge of reason. Yet we are not quite ready to rule as matter of law that nothing could possibly justify such delay in the absence of any proof of the circumstances or of any showing that the defendants themselves made any attempt to secure speedier

action, and in view of the further fact that under the terms of the report no interest has accrued against the defendants in the interval. *Lee* v. *Blodget*, 214 Mass. 374, 378. *Jordan Marsh Co.* v. *Cohen*, 242 Mass. 245, 250. *Brown* v. *Grow*, 249 Mass. 495. *B. B. Noyes Co.* v. *Ballard*, 253 Mass. 340, 341. *Hall* v. *College of Physicians & Surgeons*, 254 Mass. 95. The defendants cite *Porter* v. *Boston Storage Warehouse Co.* 238 Mass. 298, but that case seems to have been decided on the ground that judgment had been entered automatically upon failure to observe the rule. Compare, however, *Brown* v. *Grow*, 249 Mass. 495. In the case at bar the plaintiff had complied with all requirements of the present rule. We deem the report properly before us.

Upon the merits of the case as disclosed by the report the principal question is whether there was any evidence for the jury that the defendants bound themselves personally to the plaintiff by an original promise or whether at most they merely promised to answer for the debt of another for which, as there was no agreement or memorandum in writing, they are not liable under the statute of frauds, G. L. (Ter Ed.) c. 259, § 1, Second.

The salient facts leading up to the alleged promise were these: On April 16, 1926, the "Aleppo Temple Shrine Patrol and Drum Corps" purported to enter into a written contract with the "House of Ralph A. Hankinson," whereby the latter agreed in substance to produce in Boston "in its entirety" an outdoor pageant or "fireworks spectacle" called "America" for fifteen nights, "furnishing the entire production," and the former was "to sponsor" the production "under their auspices," to conduct an advance ticket-selling campaign, and to have a share in the proceeds and joint control of the receipts, but was to assume no liabilities. There was in fact "no body, unit or organization known as the Aleppo Patrol and Drum Corps." "The Aleppo Temple was a voluntary unincorporated association which had two subordinate units, one known as the Patrol and the other known as the Drum Corps, both of which were unincorporated and kept no records of their

meetings." The defendant Morrison was the chief officer, called "Potentate," of Aleppo Temple. The defendant Bolton was the chief officer of the "Patrol," called the "Major." The House of Ralph A. Hankinson was a partnership of which one Newberry, who signed the contract in its behalf, was a member. On May 15 Newberry, under the name of "American Spectacle Corporation," a nonexistent corporation, but actually in behalf of the partnership, or possibly of himself, made a written contract with the plaintiff under which the plaintiff for stipulated prices was to furnish the scenic panorama and display the fireworks for the spectacle at various places, beginning at Detroit, Michigan. In July, soon after the spectacle came to Boston, it became known to the parties that Newberry was not paying the performers, and that they were threatening to quit. Newberry had also failed to pay the plaintiff under its contract for the scenery and fireworks at Detroit and at Akron, Ohio, and the plaintiff was unwilling to continue with that part of the contract which related to Boston unless assured of its money. The "Temple" was interested as "Sponsor" that the enterprise should not end in ignominious failure.

In these circumstances conversations and negotiations took place between the plaintiff and the defendants. They need not be stated in detail. It could have been found that they came to a culmination on July 14 and 15. There was evidence of the following tenor: On July 14 at an interview between the plaintiff's representative and the defendants, the defendants said that Newberry had been "eliminated"; that they "were going to take . . . [the enterprise] over and run it themselves"; that "the Temple" would pay the plaintiff; that the plaintiff could "rest assured that we will pay you," and that "we as officers sanction this"; that "we" meant the defendants; and that the plaintiff and the defendants agreed that the plaintiff would continue to operate the spectacle in Boston and that the defendants personally would pay all the plaintiff's charges for the entire Boston engagement, both those already incurred and those to be incurred. On the next

day the plaintiff's representative and the defendants met with Newberry and all agreed that Newberry was "forced out" and should no longer "be held responsible in any way for any bills pertaining to the Boston engagement"; that thereafter Newberry's connection with the enterprise ceased, and the plaintiff continued to supply the scenery and fireworks until the end of the engagement.

If the jury believed this evidence, they could have found, taking the two conversations together, that the elimination of Newberry was understood by all parties concerned to mean that the plaintiff should no longer look to Newberry for its compensation for the exhibition in Boston, but should look to the defendants, and therefore that the defendants' promise to pay the plaintiff was an original undertaking of their own and was not a collateral undertaking to answer for any debt still owed by Newberry or his firm. Whether all the elements of a technical novation were present need not be decided. In *Colpitts* v. *L. C. Fisher Co.* 289 Mass. 232, where many cases are collected and discussed, it is said on page 234, "This statute applies only to a promise made to the creditor . . . whereby the promisor purports to add his liability to a continuing liability on the part of a principal debtor." *Kalker* v. *Bailen*, 290 Mass. 202, 205. *Doodlesack* v. *Superfine Coal & Ice Corp.* 292 Mass. 424, 427. Whether the other members of the Temple were also bound by the defendants' promise is not now material, as any question of nonjoinder of defendants in an action of contract must be raised by answer in abatement. *Feigenspan* v. *McDonnell*, 201 Mass. 341, 345. *Thomas* v. *Benson*, 264 Mass. 555, 556.

There was no variance between the declaration and the proof. The specific items in the account annexed correctly set forth the nature of the plaintiff's claims. If they are not properly described by the general allegation of goods sold and delivered, the defect is merely formal and cannot be raised at this stage of the case. *Dumas* v. *Meyer*, 296 Mass. 57, 59.

The exceptions of the defendant Morrison are overruled,

and in accordance with the stipulation included in the report judgment is to be entered for the plaintiff against both defendants in the sum of $11,915.10.

*So ordered.*