POLICE COMMISSIONER OF BOSTON *vs.* MUNICIPAL COURT OF THE DORCHESTER DISTRICT & another.

Suffolk. January 4, 1977. — March 16, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Delinquent Child. Criminal Records. Jurisdiction,* Disposition of criminal records, Delinquent child.

Discussion of the statutory framework pertaining to the creation, maintenance, preservation and dissemination of arrest records and the statutes pertaining to the powers of a Juvenile Court. [646-654]

Discussion of the Commonwealth's interest in the compilation and maintenance of arrest records and identification data. [654-658]

Discussion of the effect on individuals of the maintenance and dissemination of police records. [658-660]

The courts of the Commonwealth properly may exercise their judicial powers to order expungement or its equivalent of a juvenile's police records where the utility of the records for law enforcement purposes is likely to be minimal or nonexistent. [660-665]

A Juvenile Court has jurisdiction to order expungement of police records as a matter ancillary to its power to hear and dispose of a complaint in a manner consistent with the best interests of the child and the philosophy of the Juvenile Court system. [665-668]

Where it appeared that a judge of a Juvenile Court who ordered expungement of a juvenile's police records did not take into consideration nor balance the competing interests of law enforcement in the maintenance of the records and the interests of the juvenile, the case was remanded to the Juvenile Court for further proceedings. [668-669]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 2, 1975.

The case was reserved and reported by *Braucher,* J.

*Nicholas Foundas* for the plaintiff.

*Jonathan Brant,* Assistant Attorney General, for the Municipal Court of the Dorchester District.

*Stanley Z. Fisher* for the intervener.

LIACOS, J. This case presents for decision an issue of first impression in this Commonwealth and one which is of great import to the administration of the system of juvenile justice. The issue is whether a judge of a Municipal Court, sitting in the capacity of a Juvenile Court judge, properly ordered the police department of Boston to expunge from its records fingerprints, photographs, and other records pertaining to the arrest of a juvenile when a delinquency proceeding against him had been dismissed with prejudice. The expungement order which issued also required that same police department to retrieve copies of such data sent to other law enforcement agencies and to turn over all such records to the court for destruction.

Prior to stating the procedural history of this case, the facts underlying it, and the arguments advanced by the parties, we think it appropriate to summarize our views at the outset of this opinion. We conclude that the police department of the city of Boston generally has the right to create and maintain records pertaining to the arrest of juveniles,

but that the right to maintain and disseminate such records must be balanced against the interests of the affected juvenile from being unnecessarily harmed by their existence. We conclude that where subsequent proceedings in a Juvenile Court indicate that little or no valid law enforcement purpose is served by the maintenance and dissemination of such records, the Juvenile Court judge has jurisdiction to issue appropriate orders to require sealing, expungement or other limitations on access to such records as may be necessary to protect the interests of the juvenile. We conclude further that the order issued by the defendant judge in this case does not reflect a careful consideration of the relevant factors involved, and hence remand the matter for further proceedings.

We turn now to consideration of the relevant facts and principles involved in this proceeding. This case was initiated by a complaint filed in the county court by the police commissioner of Boston under the provisions of G. L. c. 249, § 4, and G. L. c. 211, § 3. The complaint sought relief in the nature of certiorari against the judge who caused the particular expungement order to be entered. The complaint requested the county court to quash the order of the judge or, alternatively, to remand the entire case to "an appropriate forum" for a further hearing. After the defendant judge filed his answer, the juvenile who had been arrested was allowed to intervene in the case. A single justice reserved and reported the case without decision on the pleadings and a statement of agreed facts.

The statement of agreed facts shows that the juvenile was arrested on January 10, 1975, and charged with an act of delinquency, G. L. c. 119, § 54, by reason of assault with force and intent to rob, G. L. c. 265, § 20. That matter came on for hearing in a delinquency proceeding in the juvenile session of the Municipal Court of the Dorchester District on February 7, 1975. At that time the Commonwealth informed the judge that it could not proceed with the case due to the unavailability of the alleged victim. The judge dismissed the complaint with prejudice. The juvenile's

attorney then made an oral motion for an order to compel the police department to produce for destruction the records resulting from the arrest.[1] The judge asked the juvenile's attorney to draft such an order for his signature. The request was acceded to, and on February 13, 1975, the order[2] was signed by the defendant judge.

The statement of agreed facts further shows that routine police procedures were followed in developing the records in issue. After his arrest, the juvenile had been taken to police headquarters where he was booked, fingerprinted and photographed. The records created, maintained, and disseminated are as follows:

(1) Three copies of the juvenile's fingerprints were made. One copy remained at police headquarters, one copy was sent to the Massachusetts Department of Public Safety to be filed with the identification division, and one copy was sent to the Federal Bureau of Investigation.

(2) Three copies of front and side photographs of the juvenile were made. One copy was sent to the police station in the district in which the arrest was made, one copy was sent

---

[1] The statement of agreed facts contains certain facts which relate to the adequacy of the notice to the Commonwealth. Since we order the matter to be remanded for a further hearing in light of this opinion, we need not recite those facts.

[2] After noting that the juvenile had never been arrested or had any prior contact with the Juvenile Court, the defendant judge ordered that "Commissioner Robert DiGrazia of the Boston Police Department, and his deputies, agents, and employees, remove all fingerprints, photographs and other identifying data, concerning the juvenile . . . from the criminal records information system of the Boston Police Department so that no trace of the information remains;

"It is further ORDERED that Commissioner Robert DiGrazia, his deputies, agents, and employees recall and retrieve all fingerprints, photographs and other identifying data concerning the juvenile . . . which may have been forwarded to any law enforcement agencies, in or out of the Commonwealth, so that no trace of the information so retrieved, remains;

"It is further ORDERED that Commissioner Robert DiGrazia, his deputies, agents, and employees, deliver to the Court all of the juvenile's fingerprints, photographs and identifying data, and all copies thereof which exist, so that the Court may properly destroy them."

to the Boston police department identification section, and the final copy was sent to the identification division of the Department of Public Safety.

(3) An arrest booking sheet form was completed in four copies by the booking officer at the police station. One copy was kept at the district station, a second was given to the arresting officer, and the last two were sent to central police headquarters, with one copy forwarded to the record section and one to the identification section.

(4) A so called incident report was filled out in two copies, one of which remained at the district station and one of which was forwarded to the central headquarters record section.

(5) A three-by-five inch file card was filled out at police headquarters containing the name of the juvenile and a cross-reference to yet another form maintained at headquarters containing spaces for more information.

It thus appears from the statement of agreed facts that information of varying specificity regarding the arrested juvenile was created by or distributed to: the arresting officer, the district police station, the record section and identification section at police headquarters, the identification division of the Department of Public Safety, and the Federal Bureau of Investigation.

At the time of this litigation the policy of the Boston police department regarding disclosure of juvenile arrest records was to follow the procedures established by the Legislature for dissemination of adult criminal records.[3] Thus, ju-

---

[3] General Laws c. 6, §§ 167-178, inserted by St. 1972, c. 805, § 1, created, among other things, a Criminal History Systems Board to administer and regulate "criminal offender record information [CORI]." A recent amendment to c. 6, § 167, approved after briefs had been submitted in the instant case, specifies that CORI shall not include any information concerning "criminal offenses or acts of delinquency committed by any person before he attained the age of seventeen," unless that person was adjudicated as an adult. St. 1977, c. 691, § 2. Even prior to this amendment, CORI had been construed by the board to encompass juvenile records if and only if the juvenile is "both adjudicated and receives a disposition as an adult." Criminal History Systems Board Regulation 1.5 (1974). Based

374 Mass. 640 645

Police Comm'r of Boston v. Municipal Court of the Dorchester District.

venile records could have been disseminated to "(a) criminal justice agencies and (b) such other individuals and agencies as are authorized access to [criminal offender] records by statute." G. L. c. 6, § 172, inserted by St. 1972, c. 805, § 1.[4] Authority to certify an individual or agency as qualified to receive criminal offender records was delegated by the Legislature to the Criminal History Systems Board. *Id.* Acting under that authority, the board certified a number of agencies as qualified to receive criminal records from State or local police departments, and certified another group of agencies as qualified to receive such information from author-

---

on his "substantial doubt" whether §§ 167-178, as it appeared before the recent amendment, applied to juvenile arrest records, the plaintiff police commissioner states in his brief that he "promulgated procedures within the Boston Police Department" to extend the statutory protections to juveniles. Because these procedures do not appear in the record, however, the precise extent and nature of any protections afforded as a matter of Boston police department policy are not known to this court. Further discussion in this opinion regarding dissemination of juvenile records by the Boston police department is thus based on §§ 167-178, as well as on regulations of the Criminal History Systems Board promulgated pursuant to those sections.

[4] Section 172 was struck out and replaced by St. 1977, c. 691, § 4, and amended by c. 841, subsequent to the initiation of this litigation. As amended, § 172 now provides in part that CORI, and certain other information, shall be disseminated only to "(a) criminal justice agencies; (b) such other agencies and individuals required to have access to such information by statute including United States Armed Forces recruiting offices . . . and (c) any other agencies and individuals where it has been determined [by the Criminal History Systems Board and the Security and Privacy Council] that the public interest in disseminating such information to these parties clearly outweighs the interest in security and privacy."

Statute 1977, c. 841, also added the following sentence to G. L. c. 6, § 172: "Notwithstanding the provisions of this section or chapter sixty-six A, the following shall be public records: (1) police daily logs, arrest registers, or other similar records compiled chronologically, provided that no alphabetical arrestee, suspect, or similar index is available to the public, directly or indirectly; (2) chronologically maintained court records of public judicial proceedings, provided that no alphabetical or similar index of criminal defendants is available to the public, directly or indirectly; and (3) published records of public court or administrative proceedings, and of public judicial administrative or legislative proceedings."

ized sources. The record discloses that seventy agencies were certified under the first group, and that 146 agencies were certified under the second group, although there was considerable overlap between the two groups.[5] Apart from the agencies routinely contacted by the Boston police department, the record does not disclose which, if any, of the agencies certified by the board received information regarding the juvenile involved in the case before us.

I

The plaintiff argues that the order of the Juvenile Court judge is invalid on three grounds. He argues that the order is void (a) because the plaintiff was not a party to the action in which the order was entered and was afforded inadequate notice and opportunity to be heard, (b) because it was beyond the jurisdiction and authority of the defendant judge, and (c) because it was unsupported by any facts found by him. The defendent judge and intervener juvenile argue that a judge of a Juvenile Court has inherent power to order expungement of a juvenile's record after a dismissal of charges, that the order was a reasonable means of protecting the juvenile from the harmful effects of an arrest record, and that the order was properly made, on adequate notice, within the ancillary powers of the Juvenile Court.

Necessary to the resolution of these conflicting claims is a consideration of the statutory framework pertaining to the creation, maintenance, preservation and dissemination of such records, and the statutes pertaining to the powers of the Juvenile Court. We need also identify the respective

[5]In order to provide some indication of the nature of the agencies certified by the board we list the tenth, twentieth, and so on, entries in the first group, several of which also appear in the second group: "10. Department of Youth Services"; "20. Law Enforcement Division, Department of Natural Resources"; "30. Drug Enforcement Division, U.S. Department of Justice"; "40. Fradulent Claims Board, Division of Insurance"; "50. Air Force Office of Special Investigations"; "60. United States Attorneys' Offices, U.S. Department of Justice"; "70. U.S. Park Police as a criminal justice agency for purposes of carrying out their law enforcement duties."

374 Mass. 640                                         647

Police Comm'r of Boston v. Municipal Court of the Dorchester District.

interests of law enforcement officers in the maintenance of such records and the interests of the juvenile in their expungement. We turn first to a consideration of the relevant statutes pertaining to such records.

1. *The Statutory Basis for Arrest Records.*

General Laws c. 263, § 1A, as amended by St. 1972, c. 217, provides that anyone who is arrested or taken into custody by a police officer "and charged with the commission of a felony shall be fingerprinted . . . and may be photographed. Two copies of such fingerprints and photographs shall be forwarded within a reasonable time to the commissioner of public safety . . . ." See G. L. c. 41, § 98; c. 94C, § 45. The Boston police department applied G. L. c. 263, § 1A, as applicable on its face to the juvenile in the case before us. The conduct for which the juvenile was arrested was an alleged violation of G. L. c. 265, § 20, conduct which would constitute a felony if he were an adult. The juvenile does not challenge the authority of the police to have taken fingerprints and photographs or to have compiled an arrest record, and thus we need not consider here whether a person "charged with the commission of a felony" includes juveniles who are arrested for the equivalent of a felony but charged with "delinquency" in accordance with the statutory directive. See G. L. c. 119, § 54. While there does not appear to be any explicit statutory requirement that police maintain or preserve juvenile records, the plaintiff police commissioner states that it is the policy of his department to retain them permanently. The creation and preservation of such records under such a policy would seem a proper exercise of the commissioner's statutory grant of power to provide all "needful rules and regulations for the efficiency" of the police department of Boston, St. 1962, c. 322, § 11, and within the general mandate for preservation of public records under G. L. c. 66, § 8, as amended. It appears at the outset, therefore, that these records were properly made and properly could be maintained absent some contrary statutory provision or valid judicial order.

648                                    374 Mass. 640

Police Comm'r of Boston *v.* Municipal Court of the Dorchester District.

A number of other statutes have been enacted which govern criminal records, their maintenance, dissemination, and accessibility. Before undertaking a review of those statutes that involve the disposition of criminal records, it is useful to draw attention to several factors which should be kept in mind when assessing their significance. First, the distinction between expungement of a record and sealing of a record is important. The former term refers to the type of order issued by the defendant judge in the instant case — an order to remove and destroy records "so that no trace of the information remains." The latter term refers to those steps taken to segregate certain records from the generality of records and to ensure their confidentiality to the extent specified in the controlling statute. Second, provisions relating to criminal records are to be distinguished from those pertaining to juvenile records. Finally, provisions for sealing or expunging court or probation records do not necessarily extend to records outside the court system, that is, records held by the police or other nonjudicial departments.

2. *Statutory Limitations on Dissemination.*

The Legislature has provided a mechanism for the expungement of criminal records. As we have already noted, notes 3 to 5, *supra,* a Criminal History Systems Board was created by G. L. c. 6, § 168, to administer and regulate "criminal offender record information [CORI]." The board has the duty to assure the accuracy and completeness of CORI, as well as to prevent its unauthorized disclosure. § 171. Cf. G. L. c. 66A, as amended through St. 1977, c. 691, §§ 6-13. In addition, the board is directed to promulgate regulations "assuring the prompt and complete purging of criminal record information, insofar as such purging is required by any statute or administrative regulation, by the order of any court of competent jurisdiction, or to correct any errors shown to exist in such information. . . ." G. L. c. 6, § 171. Purging is defined to mean the removal of information so that "there is no trace of information removed and no indication that said information was removed." § 167. The broad and comprehensive legislative

scheme of G. L. c. 6, §§ 167-178, for controlling the collection, maintenance, and dissemination of criminal records is not applicable to juvenile records. See note 3, *supra.*

The Legislature has provided separately for the disposition of criminal records involving the possession of a controlled substance in violation of G. L. c. 94C, § 34. Section 44 of that chapter, as appearing in St. 1973, c. 533, § 1, provides that if a person is found not guilty of a violation of § 34, or if a complaint is dismissed or an indictment "nol prossed," then "the court shall order all official records relating to his arrest, indictment, conviction, continuance or discharge to be sealed; provided, however, that department records maintained by police and other law enforcement agencies which are not public records shall not be sealed." The section also provides that a person as to whose record such sealing has been ordered will not be guilty of perjury or of making a false statement in response to any inquiry by reason of failing to recite or acknowledge the matter sealed. This section originally referred to the "expungement" of records, but was amended by St. 1973, c. 533, § 1, to refer to "sealing." The same change was made by St. 1972, c. 806, § 23, to analogous provisions of G. L. c. 94C, § 34, applicable to certain first-time offenders.

General Laws c. 276, § 100C, inserted by St. 1973, c. 322, § 1, provides that probation records and court records must be sealed in criminal cases on the request of a defendant who has been found not guilty, as to whom no bill has been returned by the grand jury, or where there has been a finding of no probable cause by the court. Sealing may be ordered by a court in a criminal case in which a nolle prosequi or a dismissal has been entered. The section requires that inquiries involving sealed records be answered by saying that no records exist, except in the case of inquiries by "any law enforcement agency or any court." Section 100A of the same chapter allows persons with certain criminal records to obtain, after a specified period of time, the sealing of court and probation records on a showing of nonconviction of other offenses. Again, inquiries involving

sealed records are to be answered with the response that no records exist, except with regard to inquiries from any law enforcement agency, any court, or any appointing authority.

Our review of statutes to this point has dealt entirely with provisions which by their terms involve records generated in the criminal, rather than the juvenile, justice system. A number of observations can be made based on that survey, however, which are relevant to the issues before us. It is clear that the Legislature has been made aware of the interests of those with arrest and court records. It is equally clear that the response of the Legislature has been measured so as to recognize the legitimate interests of courts, police and other authorities in access to such information. Sealing, in preference to expungement, of records usually has been specified where interests in confidentiality have been recognized. Police, as well as courts, have been given special consideration with regard to access to sealed information. Additionally, specific legislative authorization for the sealing of records has extended only to court and probation records; arrest or other police records have not been included in the specific sealing provisions and, in at least one instance, nonpublic police records have been explicitly excluded.

Overlaying the specific sealing provisions is the broad regulatory scheme of G. L. c. 6, §§ 167-178, establishing a criminal record information system. These administrative mechanisms for ensuring confidentiality of records, and purging of records when appropriate, are provided to effectuate legislative policies regarding criminal history records. The Legislature thus has indicated that the purging, or expungement, of such records is potentially available; this action may be taken as provided by statute or by authorized administrative regulation. G. L. c. 6, § 171. Additionally, the further provision that purging may be required "by the order of any court of competent jurisdiction," *id.*, is not to be read as a grant of power to issue such orders, but as

recognition of the authority of courts to act to the full extent of their previously existing jurisdiction.[6]

3. *Juvenile Records.*

Having canvassed those statutory provisions relative to the disposition of criminal records, we now focus on the activity of the Legislature specifically with regard to juvenile records.

The Legislature has taken action to protect juveniles against the consequences of the free and open dissemination of the records of juvenile delinquency proceedings. In G. L. c. 119, § 60, the Legislature mandated that an adjudication of delinquency shall not be admissible in any proceeding involving the juvenile, except subsequent delinquency proceedings or for purposes of disposition, and, in addition, provided that such prior histories should not disqualify the juvenile from efforts to obtain public employment in the Commonwealth. While the policy of the statute may, in limited instances, have to yield to countervailing constitutional considerations, see *Davis* v. *Alaska,* 415 U.S. 308 (1974), we have recognized that it was the intent of the Legislature "to provide broadly for the confidentiality of juvenile records." *Commonwealth* v. *Ferrara,* 368 Mass. 182, 185 (1975). See also *Commonwealth* v. *A Juvenile,* 361 Mass. 214 (1972). General Laws c. 119, § 60A, limits access to court records in a juvenile case and precludes public inspection of them. Finally, § 65 of that chapter precludes public access to juvenile proceedings.

---

[6] Criminal History Systems Board Regulation 1.15 (1974) provides that criminal offender record information (CORI) "with respect to any criminal proceedings in which a nolle prosequi or dismissal has been entered, or the court has ordered the sealing of the records of such proceeding," shall not be disseminated from the automated CORI system except as specifically provided in Regulation 1.18. That section allows access to CORI for use by the board, for statistical purposes, for the use of the affected individual, for sentencing purposes, and for use in a pending criminal investigation if the chief of a criminal justice agency certifies that the information is necessary. Regulation 1.21 provides for the purging of CORI "[u]pon any valid, final court or administrative order." These regulations also recognize the authority of the courts to order the sealing or expungement of criminal records.

The above statutes relate to the court records of such juvenile proceedings. The Legislature has also dealt with the subject of probation records produced as a result of such proceedings in G. L. c. 276, §§ 100A, 100B. In particular, § 100B, inserted by St. 1972, c. 404, provides for the "sealing" of probation records and court records in juvenile proceedings after the lapse of three years and a subsequent unblemished record. After such sealing, inquiries from a law enforcement agency in response to the existence of such a record are to be answered: "[S]ealed delinquency record over three years old," while inquiries from other agencies are to be answered: "[N]o record." Like G. L. c. 119, § 60, § 100B precludes these records from being used as a disqualification from public employment. Section 100B seemingly contemplates an instance where there has been a finding of delinquency under G. L. c. 119, § 54.

General Laws c. 276, § 100A, as amended through St. 1975, c. 278, also provides protection for juveniles from economic harm in regard to employment opportunities. The Commissioner of Probation, in response to all authorized inquiries except those from law enforcement agencies, is directed to state that no record exists where there exist records of court appearances and adjudications of delinquency in cases which have not been transferred to the Superior Court. Section 100A also allows a juvenile in the same class of cases to respond "no record" to an appropriate inquiry in an application for employment, by virtue of the following language: "[A]ny applicant for employment may answer 'no record' with respect to any inquiry relative to prior arrests, court appearances and adjudications in all cases of delinquency or as a child in need of services which did not result in a complaint transferred to the superior court for criminal prosecution." This provision makes no reference to whether the juvenile record is sealed.[7]

---

[7] A parallel provision in § 100A regarding criminal records specifies that the record be sealed. Both provisions may be enforced by the Attorney General by a suit in equity commenced in the Superior Court. G. L. c. 276, § 100A.

4. *Police Department Records.*

This survey of the applicable statutory law shows that the Legislature has recognized the need to take action to minimize the harm that can flow from the ready availability of Juvenile Court and probation records.[8] However, none of the statutes, except for the proviso in G. L. c. 94C, § 44, concerns the dissemination of records not maintained by either the court or probation department; that is the type of record ordered expunged in this case — the records maintained and disseminated by law enforcement agencies in the Commonwealth.

A remedy to this gap was attempted by the enactment of St. 1972, c. 805, § 1, inserting G. L. c. 6, §§ 167-178. The statutory scheme, previously described, seems only to authorize "purging" of data from the system if it is found to be "inaccurate, incomplete or misleading," but the Criminal History Systems Board may order that the records be modified or supplemented as opposed to purged. G. L. c. 6, § 175. The salient fact about this entire scheme however is that in restricting its applicability to "criminal offender record information," the statute excluded noncriminal proceedings such as those involving juveniles, see G. L. c. 6, § 167, as amended through St. 1977, c. 691, § 2, and the board so limited its jurisdiction. Criminal History Systems Board Regulation 1.5 (1974). This latter factor would negate the applicability of this statutory scheme to this case but for the fact that the Boston police department treats

---

[8] The provisions of G. L. c. 276, § 100A, giving added protection to the confidentiality of juvenile records were inserted by St. 1975, c. 278. A number of other bills were proposed, particularly by the Commissioner of the Department of Youth Services, in the same and subsequent sessions of the Legislature to give even broader protection to juveniles, but were not enacted. Some of these bills would have reached police arrest and finger-print records and provided for sealing or expungement in certain circumstances. See, e.g., 1975 House Doc. Nos. 358, 362, 363 (proposed amendment to G. L. c. 276, § 100B). See also 1976 House Doc. Nos. 228, 229, 5040; 1977 House Doc. Nos. 290, 291, 6309.

juvenile records the same as adult records consistent with the guidelines of the board.[9]

A number of things appear from the above analysis. First, to the extent that the provisions of G. L. c. 6, §§ 167-178, may offer the juvenile protection from the adverse consequences of the dissemination of his record, such protection is only available in Boston; even then it is dependent on administrative fiat. Second, it appears that, in regard to adult records, G. L. c. 6, § 171, authorizes the promulgation of regulations for "purging" in accord with the order of a court of competent jurisdiction, thus recognizing a judicial power, left undisturbed by statutory enactment, to order the expungement or its equivalent of certain criminal justice data apart from the Criminal History Systems Board regulations and the statute. Third, there is at present no statutory right to expungement of juvenile records maintained by a police department. We do not conclude, however, that the Legislature has sought to preempt judicial power in this area. The failure of the Legislature to take action to limit access to juvenile records maintained by a police agency does not preclude the exercise of judicial power under the appropriate principles of law. We proceed to examine those principles.

## II

1. *The State Interest in the Compilation and Maintenance of Arrest Records and Identification Data.*

The previous survey of legislative enactments and administrative policies concerning the compilation, mainte-

---

[9] The record shows that the Boston police department has a system to record the disposition of each case to attempt to ensure complete accuracy but that the system depends on each police district for its efficacy. When such records are complete they are forwarded to the Federal Bureau of Investigation on a prescribed form. That form allows the Boston police department or other agency to request a return of the record due to a court-ordered expungement. See *Menard* v. *Saxbe,* 498 F.2d 1017 (D.C. Cir. 1974). We note that the Boston police department will disseminate the record to the proper agency without a notation of the final disposition.

nance, accessibility and dissemination of court and probation records, as well as arrest records and other identification data falling under the generic classification of criminal offender record information, indicates that the State has an expressed interest in the compilation of such records. Our review of statutory and administrative materials also indicates recognition of countervailing individual interests in being protected from the harm which may be caused the individual by this record keeping system.

The maintenance of fingerprint, photograph and arrest records serves an important law enforcement function. It has been said that juvenile arrest records are necessary to know an offender's previous antisocial behavior to determine appropriate dispositions and that their maintenance provides a source of information about persons and conditions which may threaten the public welfare. Ferster & Courtless, The Beginning of Juvenile Justice, Police Practices and the Juvenile Offender, 22 Vand. L. Rev. 567, 602-603 (1969). Moreover, it has been noted that arrest records serve "as a means for identification and apprehension of criminals . . .. Statistical experience tells [police] that persons with arrest records commit a higher percentage of crimes than persons who do not have arrest records." *Morrow* v. *District of Columbia,* 417 F.2d 728, 748 (D.C. Cir. 1969) (Tamm, J., dissenting in part). *United States* v. *Kalish,* 271 F. Supp. 968 (D.P.R. 1967). In addition to the records of arrest, additional justifications have been advanced for the retention of fingerprints. Most particularly, it is said that the maintenance of such files allows identification of "a person printed on a given occasion as the same person who was printed on a previous occasion. The purpose of this procedure is to establish the presence or absence of a record of previous offenses." Ferster & Courtless, *supra* at 598.

More specific justifications have been advanced for the retention of juvenile arrest records. One court, noting numerous incidents of juvenile crime, has stated that such records may be of assistance in informally disposing of the

matter without the necessity of judicial involvement. *Monroe* v. *Tielsch*, 84 Wash. 2d 217 (1974). The court also felt that the information contained in such arrest records was an indispensable adjunct to the rehabilitative powers of the Juvenile Court and thus denied a request for expungement.

Two points should be readily apparent. The first is that arrest records play an integral role in the over-all function of the criminal justice system in terms of the investigative, prosecutorial,[10] and dispositional phases of a transaction in the system of criminal justice. The more salient point, however, is that the extent to which these functions are served by the existence, compilation, and maintenance of the arrest records is in direct proportion to the extent that the assumptions underlying the utility of the records are in fact valid. Adverse action taken against an individual because of his arrest record is premised on certain assumptions regarding the meaning of the arrest. In so far as these assumptions differ from reality, the adverse action will have an erroneous basis. *Menard* v. *Mitchell*, 430 F.2d 486, 491 (D.C. Cir. 1970), remanded, 328 F. Supp. 718 (D.D.C. 1971), remanded sub nom. *Menard* v. *Saxbe*, 498 F.2d 1017 (D.C. Cir. 1974). Cf. *Loder* v. *Municipal Court*, 17 Cal. 3d 859 (1976), cert. denied, 429 U.S. 1109 (1977). Thus, expungement has been ordered where a person was detained but not arrested, *Menard* v. *Saxbe*, 498 F.2d 1017 (D.C. Cir. 1974); where there was a dismissal or nolle prosequi entered prior to trial, *United States* v. *Bohr*, 406 F. Supp. 1218 (E.D. Wis. 1976); where the defendant was acquitted, *Davidson* v. *Dill*, 180 Colo. 123 (1972); or where other factors exonerated the defendant and it was clear that he was free of any taint of suspicion of participation in criminal conduct. See *In re Smith*, 63 Misc. 2d 198 (N.Y. Fam. Ct. 1970). Moreover, arrests which have been tainted by illegality, bad faith, malice or misconduct on the part of law enforcement agencies have been expunged. *Sullivan* v. *Mur-*

---

[10] Prior records or lack thereof may be significant in the initial decision to charge the arrestee.

*phy,* 478 F.2d 938 (D.C. Cir.), cert. denied, 414 U.S. 880 (1973). *United States* v. *McLeod,* 385 F.2d 734 (5th Cir. 1967). *Hughes* v. *Rizzo,* 282 F. Supp. 881 (E.D. Pa. 1968). The fact of an arrest without probable cause followed by total exoneration would seem to negate any possible value to law enforcement of an arrest record because the sum total of such an adjudication is that there was no evidence in any way connecting the defendant with participation in criminal activity. *Menard* v. *Mitchell,* 430 F.2d at 491. Cf. *Sullivan* v. *Murphy, supra.* Finally, if an arrest is predicated solely on the exercise of constitutionally protected conduct and is thus a nullity, its value as a tool of law enforcement should be the same as that resulting from a total exoneration from criminal liability.[11]

---

[11] A number of courts have ordered expungement of local police records "as an appropriate remedy in the wake of police action in violation of constitutional rights." *Sullivan* v. *Murphy,* 478 F.2d 938, 968 (D.C. Cir.), cert. denied, 414 U.S. 880 (1973), citing *United States* v. *McLeod,* 385 F.2d 734 (5th. Cir. 1967) (arrests intended to disrupt voter registration drive). *Wheeler* v. *Goodman,* 306 F. Supp. 58 (W.D.N.C. 1969), vacated 401 U.S. 987 (1971) (three-judge court) (Fourth Amendment violations in enforcing overbroad vagrancy law). *Hughes* v. *Rizzo,* 282 F. Supp. 881 (E.D. Pa. 1968) (mass arrests of members of "hippie" cult congregating in public park). Although expungement of police records has thus often been based on deprivation by the police of Fourth or Fifth Amendment rights, see *Menard* v. *Saxbe,* 498 F.2d 1017, 1023-1025 (D.C. Cir. 1974), such orders are not limited to vindication of constitutional rights. What generally is required is a "balancing of law enforcement needs against the privacy and other interests of affected individuals" and an "analysis of whether legitimate law enforcement needs may be served in a manner which does not unduly trench upon the individual's rights." *Utz* v. *Cullinane,* 520 F.2d 467, 474-475 n.10 (D.C. Cir. 1975) (limitations on dissemination of police records, not expungement, sought; decided on statutory grounds). See *United States* v. *Linn,* 513 F.2d 925, 928 (10th Cir.), cert. denied, 423 U.S. 836 (1975) (right to privacy recognized, but not shown by facts to outweigh State interest in instant case). Cf. *St. Paul* v. *Froysland,* 310 Minn. 268 (1976). The parties have not argued, nor do we reach on the facts of the instant case, the issue whether, and to what extent, constitutional rights or a right to privacy under the State's Constitution, its statutes, e.g., G. L. c. 214, § 1B, inserted by St. 1974, c. 193, § 1, or its common law should be vindicated by expungement or other appropriate orders involving police records. To the extent that some of the cases cited relied on a Federal constitutional claim of a right to privacy,

What is evident then is that there are situations where the maintenance of criminal records of a particular individual cannot be said to serve any valid law enforcement purpose because the events whose happening they reflect are of little or no relevance to the individual's likelihood of participation in future criminal activities or necessary to the achievement of other ancillary goals of the criminal justice system. The nature and extent of the interest of the State in the maintenance of such records in such circumstances must be weighed against the harm that may befall the individual from their existence. See *Kowall* v. *United States*, 53 F.R.D. 211 (W.D. Mich. 1971). See also *Morrow* v. *District of Columbia*, 417 F.2d 728, 743 (D.C. Cir. 1969).

2. *The Nature of Harm to the Individual.*

In recent years much attention has been focused on cases dealing with the effect on individuals of the maintenance and dissemination of arrest records. See Annot., 46 A.L.R.3d 900 (1972); Annot., 71 A.L.R.3d 753 (1976) (juveniles); Volenik, Juvenile Court and Arrest Records, 9 Clearinghouse Rev. 169 (1975); Comment, Amplification of Arrest Records by Criminal Courts: A Judicial Compromise, 13 Am. Crim. L. Rev. 139 (1975); Comment, Police Records of Arrest: A Brief for the Right to Remove Them from Police Files, 17 St. Louis L.J. 263 (1972); Comment, Arrest Record Expungement — A Function of the Criminal Court, 1971 Utah L. Rev. 381 (1971). See also Countryman, The Diminishing Right of Privacy: The Personal Dossier and the Computer, 49 Tex. L. Rev. 837 (1971).

The very reasons which are asserted in part to justify retention of such records may serve as the source of the injury.[12] "An arrest record may be used by the police in deter-

see, e.g., *Davidson* v. *Dill*, 180 Colo. 123, 128 (1972); *United States* v. *Kalish*, 271 F. Supp. 968 (D.P.R. 1967); *Kowall* v. *United States*, 53 F.R.D. 211 (W.D. Mich. 1971); *Eddy* v. *Moore*, 5 Wash. App. 334 (1971), their premises may well be invalidated by *Paul* v. *Davis*, 424 U.S. 693 (1976). See Mr. Justice Brennan's dissent therein, *id.* at 735-736 n.18.

[12] The juvenile argues that the existence, dissemination, and use of his arrest record can injure him in at least three respects: economic harm, in-

mining whether subsequently to arrest the individual concerned, or whether to exercise their discretion to bring formal charges against an individual already arrested. Arrest records have been used in deciding whether . . . [to deny] release prior to trial or an appeal; or they may be considered by a judge in determining the sentence to be given a convicted offender" (footnotes omitted). *Menard* v. *Mitchell,* 430 F.2d at 490-491.

Although in our society the mere fact of arrest is not considered probative of anything, *Schware* v. *Bar Examiners of N.M.,* 353 U.S. 232 (1957), the fact remains that "[a]ny citizen, even one with an absolutely clean lifetime record of not violating the law, through a series of circumstances could find himself charged with a violation of the law even though he may be entirely innocent of the charges. Our system of criminal justice will in due course bring out the truth and he will be cleared. But his record will not be cleared. And although he has been cleared under our laws, at any future time the cloud of prosecution against him will remain to all who one way or another gain access to it: be it inquiries concerning employment . . . or investigations concerning other criminal offenses." *United States* v. *Dooley,* 364 F. Supp. 75, 78-79 (E.D. Pa. 1973). See also Hess &

---

jury to his reputation, and injury within the criminal justice system. Within the category of economic harm he identifies the subcategories of harm to one's credit rating, see *Fite* v. *Retail Credit Co.,* 386 F. Supp. 1045 (D. Mont. 1975), aff'd, 537 F.2d 384 (9th Cir. 1976); and harm to one's employability, see, e.g., *Bilick* v. *Dudley,* 356 F. Supp. 945, 950 (S.D.N.Y. 1973); *Menard* v. *Mitchell,* 328 F. Supp. 718 (D.D.C. 1971), remanded sub nom. *Menard* v. *Saxbe,* 498 F.2d 1017 (D.C. Cir. 1974); Hess & LePoole, Abuse of the Record of Arrest Not Leading to Conviction, 13 Crime and Delinquency 494 (1967). The juvenile urges that the mere fact of arrest inevitably stigmatizes him in his community notwithstanding the fact that the charges against him were dismissed with prejudice, see, e.g., *McKeiver* v. *Pennsylvania,* 403 U.S. 528, 544 n.5 (1971); *In re Winship,* 397 U.S. 358, 367 (1970). Finally, he claims that dissemination of his police record within the criminal justice system — to the police, courts, and probation department — causes harm sufficient to warrant expungement. See *St. Louis* v. *Drolet,* 39 Ill. App. 3d 27 (1976), aff'd, 67 Ill. 2d 43 (1977).

LePoole, Abuse of the Record of Arrest Not Leading to Conviction, 13 Crime and Delinquency 494, 497 (1967).

It is particularly clear that the existence of such records is likely to be devastating in the case of the juvenile. The potential for further contact and possible harrassment by law enforcement authorities predicated on the existence of a worthless or almost worthless arrest record is likely to breed a cynicism and disrespect for the law which could not help but be counterproductive in so far as rehabilitation of the juvenile is sought.[13] Furthermore, as the problem of youth employment is readily apparent, the problem is further aggravated by the existence of records which have the potential to work to the detriment of the job-seeking youth.

The apprehension of injury from a juvenile arrest record is not without basis in Massachusetts. We have seen that there are no statutes in the Commonwealth regulating the maintenance and dissemination of juvenile arrest records. The possibility of their availability to sundry governmental agencies has been demonstrated. Even in Boston, where the police department follows an administrative policy of adhering to the Criminal History Systems Board guidelines, the protections afforded are less effective than may appear.

To be considered together with this substantial danger of harm to the juvenile is recognition that the maintenance of the source of the injury may not serve any valid State purpose. More to the point, as the apparent utility of the records decreases, there is a concomitant increase in the juvenile's interest in being insulated from the possible adverse consequences of the existence and dissemination of the records.

3. *The Power of the Courts to Order Expungement.*

It appearing that there is a grave potential for injury to a juvenile due to the maintenance and dissemination of his records, and that the statutes of the Commonwealth, the

---

[13] See G. L. c. 119, § 57, empowering juvenile probation officers to investigate previous "complaints" (not necessarily resulting in adjudication of delinquency).

policy of the Boston police or Federal regulations are insufficient to prevent its occurrence, we conclude that the power to order expungement or its equivalent, see *Sullivan* v. *Murphy*, 478 F.2d 938, 973 (D.C. Cir.), cert. denied, 414 U.S. 880 (1973),[14] is a power that properly may be exercised by the courts of the Commonwealth as a necessary adjunct to their exercise of judicial power.[15] "Various powers which, regarded by themselves in the abstract, might be deemed legislative or executive have been considered proper to be exercised by courts because they were intimately connected with and necessary or auxiliary to the exercise of strictly judicial powers." *LaChapelle* v. *United Shoe Mach. Corp.*, 318 Mass. 166, 170 (1945). The power properly may be exercised where the utility of the records for law enforcement purposes is likely to be minimal or nonexistent.[16] Thus,

---

[14] "It may be, however, that measures short of physically destroying the records in question will prove adequate to assure complete and effective relief. For example, an order placing the original documents under seal and prohibiting disclosure of their contents, except upon further order of the District Court predicated on a showing of good cause, may provide a remedy reasonably equivalent to expungement in terms of protection of plaintiffs' rights. The balance of government interests may warrant different treatment for different police records. As we pointed out in Morrow v. District of Columbia [417 F.2d 728 (D.C. Cir. 1969)], the chief threat to the individual who has been unlawfully arrested arises from the inclusion of his records in the police department's central criminal files. . . . At its present stage of development, the record in the case at bar is insufficiently developed to permit an informed choice among these alternatives. Consequently, details of fashioning a suitable remedy are remitted to the District Court's further consideration on remand" (footnote omitted).

[15] To the extent no violation of constitutional rights is involved as the predicate of the exercise of judicial power, nothing we say here precludes the Legislature from acting in this field. What we deal with in this case is the issue of the power of the lower courts, and, in particular, a Juvenile Court, to issue appropriate orders ancillary to their existing statutory and common law jurisdiction. See *New England Tel. & Tel. Co.* v. *District Attorney for the Norfolk Dist.*, *ante* 569, 572-573 (1978); G. L. c. 220, § 2.

[16] The judicial power we assert here is based on our view of the ancillary jurisdiction of the courts and not on any view of constitutional matters, an issue we do not reach, as it is not raised on this record.

where a juvenile proceeding has been terminated due to the absence of any evidence of delinquency, expungement would seem justified. On the other hand, if there is a disposition of the case favorable to the juvenile due to matters not necessarily supportive of a finding of noninvolvement in delinquent behavior, the need for the remedy, in terms of the injury sought to be avoided, becomes correspondingly less. In such latter instance, no order of expungement may be indicated, or a less drastic measure, such as ordering the records sealed or placing other limitations on dissemination and access, may be sufficient. See *People* v. *Michael L.*, 80 Misc. 2d 292 (N.Y. Dist. Ct. 1975).

We note that requests to expunge have arisen in a variety of procedural settings, including civil rights proceedings, post-conviction proceedings, and actions brought directly against the custodian of the records sought to be expunged. See *United States* v. *Linn*, 513 F.2d 925 (10th Cir.), cert. denied, 423 U.S. 836 (1975), for a summary of cases involving these various procedures. The *Linn* case involved, as does this case, a request to expunge in the proceedings in which the arrestee received a favorable disposition. The *Linn* court held that the trial court had such power. The power of a court in such circumstances is not dependent on its possession of general equity powers, *Morrow* v. *District of Columbia*, 417 F.2d 728 (D.C. Cir 1969), see *St. Paul* v. *Froysland*, 310 Minn. 268 (1976), but is an incident of and ancillary to the court's original jurisdiction.

The terms "jurisdiction" and judicial "power" often are used interchangeably, for jurisdiction "is a term of comprehensive import." *Paige* v. *Sinclair*, 237 Mass. 482, 483 (1921). Jurisdiction concerns and defines the power of courts, encompassing the power to inquire into facts, apply the law, make decisions, and declare judgment. *Id.* at 483-484. It is a first principle that the jurisdictions of the several lower courts of this Commonwealth, and therefore their powers, are limited to those granted by the Constitu-

tion of the Commonwealth or by the Legislature.[17] *Mountfort* v. *Hall*, 1 Mass. 443, 457 (1805). Such grants must either be articulated expressly or be capable of being deduced by "necessary and inevitable" implication. *Id.* See *Crocker* v. *Superior Court*, 208 Mass. 162, 171 (1911) (or by "fair implication"). It has been said that a grant of jurisdiction "carries with it by implication power to use the necessary means to exercise and enforce that jurisdiction." *Commonwealth* v. *New York Cent. & H.R. R.R.*, 206 Mass. 417, 429 (1910). This power is to be exercised so as not to "deny the existence of a jurisdiction which was intended by the Legislature to be given." *Id.* at 428. Occasionally, broad language will be employed where the intended powers of the court threaten to be frustrated by overly narrow or artificial constructions. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 227 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972) (Superior Court in a criminal trial "has many powers not found in express language of statutes").

---

[17] Another theory of "inherent power" is developed with great care by Justice, later Chief Justice, Rugg in *Crocker* v. *Superior Court*, 208 Mass. 162 (1911). That case established the "inherent power of common law courts" to order a change of the place of trial from one county to another where local prejudice prevented the securing of a fair and impartial trial. *Id.* at 175. The jurisdiction of the Superior Court to make such an order was not based on any statute, but was established by an exhaustive study of the "general common law power of the court." *Id.* at 165-166. Central to this reasoning was Part II, c. 6, art. 6, of the Constitution of the Commonwealth which, as adopted in 1780 and as remains unamended today, provided: "All the laws which have heretofore been adopted, used and approved, in the Province, Colony or State of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force, until altered or repealed by the legislature; such parts only excepted as are repugnant to the rights and liberties contained in this constitution." Quoted in *id.* at 171. Cf. *Hannigan* v. *New Gamma-Delta Chapter of Kappa Sigma Fraternity, Inc.*, 367 Mass. 658, 660 (1975). No claim has been made in the case before us that the power to expunge police records is "inherent" in a Juvenile Court in the sense of the *Crocker* opinion.

We have also recognized a range of "inherent powers" exercisable by the courts of the Commonwealth. That phrase is most often used in a sense closely akin to the principle that jurisdiction may be recognized by necessary implication from constitutional or statutory provisions. Judicial authority "is not limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate." *O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507, 510 (1972). We held in *O'Coin's* that a judge has the "inherent power" to purchase required goods or services to protect the ability of the court to function. Similarly, in an advisory opinion of the Justices the Justices viewed the judicial branch as holding the ultimate power regarding admissions to the bar. The Justices reasoned that the establishment by the Constitution of the judicial department "conferred authority necessary to the exercise of its powers as a co-ordinate department of government." *Opinion of the Justices,* 279 Mass. 607, 609 (1932). It followed that there was "inherent power" to determine the qualifications of those to be admitted to practice in the courts or to assist in their work. *Id.* See also *Collins* v. *Godfrey,* 324 Mass. 574, 577-579 (1949); *LaChapelle* v. *United Shoe Mach. Corp.,* 318 Mass. 166, 170 (1945). In *Boyajian* v. *Hart,* 312 Mass. 264, 266-267 (1942), this court stated that courts have power both in actions at law and in suits in equity to adopt procedures to prevent vexatious litigation.

The primary purpose of recognizing ancillary jurisdiction is to ensure that a particular court judgment is given complete and final effect. Subsumed within this broad rationale are practical considerations in favor of judicial economy and against piecemeal litigation which are effectuated by allowing a litigant to resolve all matters arising from a particular transaction in a single forum and in a single proceeding. *Morrow* v. *District of Columbia,* 417 F.2d 728

374 Mass. 640                                                665

Police Comm'r of Boston *v*. Municipal Court of the Dorchester District.

(D.C. Cir. 1969). Cf. *St. Paul* v. *Froysland,* 310 Minn. 268 (1976).[18]

4. *The Power of a Juvenile Court to Order Expungement.*

The plaintiff commissioner has argued that even if the power of expungement may be exercised by the courts in the Commonwealth, the Juvenile Court is not among those so empowered. He grounds this argument first on the lack of specific statutory authorization. His second argument concerns the fact that the Juvenile Court does not possess the necessary powers of equity to order the particular remedy. In this context, the plaintiff's complaint prays that, should

---

[18] "Ancillary jurisdiction has been referred to as 'a common sense solution' of the problems courts, *especially courts of limited jurisdiction,* face in attempting to 'do complete justice in the premises.' If no such powers existed, parties would be forced to go to different courts to obtain complete relief" (footnote omitted; emphasis added). *Morrow* v. *District of Columbia,* 417 F.2d 728, 738 (D.C. Cir. 1969), quoting from 1 W.W. Barron & A. Holtzoff, Federal Practice and Procedure § 23 (Wright rev. ed. 1960). Thus, in the appropriate circumstances, courts may consider and decide matters "ancillary or incidental to, or growing out of, the main action" which, as original causes of action, would not be within the jurisdiction of the court. *Id.* at 737-738, quoting from 21 C.J.S. Courts § 88, at 136-138 (1940).

The expungement order in the case before us has been characterized as an exercise of remedial power pursuant to the ancillary jurisdiction of the Juvenile Court. It is possible that the characterization of the order as an exercise of remedial power was intended to invoke a secondary meaning of the term "ancillary jurisdiction" — that of the "power of a court to issue *different types of remedies* to effectuate its conceded jurisdiction over some subject matter." *Morrow* v. *District of Columbia, supra* at 732 n.10. We agree with the *Morrow* court that the use of the term would be more appropriately reserved for situations of the type first discussed, and not where the court's jurisdiction over the matter is conceded and only the extent of relief is at issue. See *id.* at 732-733 n.10. However, we need not conclude in this case that the order of expungement directed to the police was merely a particular form or type of relief effectuating the court's conceded jurisdiction to determine the delinquency case before it. The order was intended to remedy the perceived injustice of stigmatizing this juvenile with an arrest record that would survive the dismissal of the charge against him. See *Menard* v. *Saxbe,* 498 F.2d 1017, 1023 (D.C. Cir. 1974) ("The judicial remedy of expungement is inherent and is not dependent on express statutory provision, and it exists to vindicate substantial rights provided by statute as well as by organic law" [citation omitted]).

we conclude that the expungement order not be quashed, we remand the case in the alternative for further hearings before an "appropriate forum." [19] The defendant judge and the intervener juvenile argue that a Juvenile Court has jurisdiction to order expungement ancillary to its power to dispose of a case.

The District Courts, including the juvenile session of the Municipal Court of the Dorchester District, are "courts of superior and general jurisdiction with reference to all cases and matters in which they have jurisdiction . . . ." G. L. c. 218, § 4. See G. L. c. 218, §§ 19-20 (civil), §§ 26-37 (criminal). That the District Courts are not courts of general equity jurisdiction, see G. L. c. 218, § 19C, is of no particular relevance to the question of the proper exercise of their powers under the statutes granting jurisdiction to these courts as to matters involving juveniles. Delinquency proceedings against juveniles are governed by G. L. c. 119, §§ 52-63, and jurisdiction in the first instance lies exclusively in the juvenile session. *Joyner* v. *Commonwealth,* 358 Mass. 60, 62 (1970).

The philosophical underpinnings of the juvenile justice system in this Commonwealth are revealed in the directive that statutes concerning delinquency proceedings "shall be liberally construed so that the care, custody and discipline of the children brought before the court shall approximate as nearly as possible that which they should receive from their parents, and that, as far as practicable, they shall be treated, not as criminals, but as children in need of aid, encouragement and guidance." G. L. c. 119, § 53. This court has often recognized the unique character of the Juvenile Courts as forums in which, to the extent possible, the best interests of the child serve to guide disposition. This rehabilitative goal applies equally to juveniles charged with the most serious offenses as to those charged with minor offenses. *A Juvenile* v. *Commonwealth,* 370 Mass. 272,

---

[19] The plaintiff fails to specify what forum or procedure would be an "appropriate" one, however.

282-283 (1976). The aims of "correction and redemption" of delinquent children are to be accomplished in part by the very broad discretion allowed Juvenile Court judges with regard to disposition, see G. L. c. 119, § 58, and transfer to criminal court, *id.* at § 61, as well as by the implementation of special procedures "to avoid infringement of the constitutional rights of juveniles and . . . to avoid attaching to them the stigma of a criminal." *Metcalf* v. *Commonwealth,* 338 Mass. 648, 651 (1959). Even while certain adjudicatory rights of juveniles recently have been given formal recognition by the United States Supreme Court, the "idealistic prospect of an intimate, informal protective proceeding" has been found to weigh against other claimed adjudicatory rights such as that of a jury trial. *McKeiver* v. *Pennsylvania,* 403 U.S. 528, 545 (1971). Moreover, the unique character of the post adjudication, dispositional phase of juvenile proceedings has been explicitly preserved despite a retreat from the strictly paternalistic notions formerly associated with the adjudicatory phase of delinquency proceedings. *In re Gault,* 387 U.S. 1, 31 n.48 (1967). The Court has recognized the value of leaving unimpaired "the opportunity during the post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history and for his individualized treatment." *In re Winship,* 397 U.S. 358, 366 (1970).

The statutory and case law of this Commonwealth thus firmly support the assertion that the Juvenile Courts have a broad mandate to act in furtherance of a child's welfare. Moreover, this special characteristic of Juvenile Courts has been recognized and respected by the Supreme Court in the course of delineating those Federal constitutional safeguards applicable to juvenile proceedings. It may appear that an expungement order directed to the police is an exercise of power different in kind from an exercise of discretion regarding disposition after a finding of delinquency. Such an expungement order is motivated, however, by the same concerns regarding adverse present and future consequences

of a juvenile record of police or court involvement that lie behind a number of legislative enactments.

The position asserted by the defendant judge and the intervener is consistent with the philosophy underlying the juvenile justice system. General Laws c. 119, § 53, states a rehabilitative philosophy which mandates the avoidance of the attachment of the stigma of criminality to the juvenile. *Metcalf* v. *Commonwealth,* 338 Mass. 648, 651 (1959). A *Juvenile* v. *Commonwealth,* 370 Mass. 272, 282-283 (1976). There would be a considerable irony if a court charged with exercising its function in a manner consistent with § 53 was viewed not to have the power to take the necessary steps to ensure that in proper circumstances the juvenile shall suffer no injury as a result of involvement with the judicial process by the dissemination of records which have in some ways an impact equivalent to criminal records. Accordingly, the scope of a Juvenile Court's powers necessarily implies that a Juvenile Court has jurisdiction to order expungement of police records as a matter ancillary to its power to hear and dispose of a complaint in a manner consistent with the best interests of the child and the philosophy of the Juvenile Court system. See *In re Smith,* 63 Misc. 2d 198, 204 (N.Y. Fam. Ct. 1970).

### III

Given our recognition of the potential injuries which may flow from the maintenance and dissemination of the records in this case, it is clear that in the proper circumstances a final, complete and effective disposition of the juvenile complaint will require expungement.[20] It is also obvious

---

[20] We emphasize that the records as to which expungement or sealing may be ordered are only those which reveal the identity of the juvenile. To be distinguished are those bookkeeping or administrative entries necessary for the preservation of departmental records, e.g., those showing the incident, receipt of a complaint, assignment of officers, and so on, or those necessary for statistical purposes. In short, so long as the juvenile's identity is not shown, his interests would appear to be satisfied.

that the initiation of a separate action will not only be counter to the necessities of judicial economy, but that it will also deprive both sides in the case of the opportunity to have the issue decided by a judge who is most familiar with the particular case and with the factors affecting juvenile behavior which weigh in favor of or against expungement. In light of these considerations, no judicial policy that we know of militates in favor of a separate forum. To the contrary, the policies tend to favor residing the locus of power in the Juvenile Courts.

The record in this case fails to reveal, however, that there was any consideration by the defendant judge of the interests of law enforcement in the maintenance of the records in issue. Nor is it shown whether the order of expungement was issued in light of a reasoned view that such an order furthered the interests of the intervener juvenile. Since the principles we have set forth in this opinion require a consideration and balancing of the competing interests involved, we cannot say that the defendant judge's order was properly issued on the basis of the record before us. Further, we agree with the plaintiff that adequate notice and opportunity to be heard ought to be given to all parties, including one in the position of the plaintiff, before such an order be entered. In ruling on the request for the issuance of an order of expungement (or sealing) a written statement by the judge setting forth the facts, the interests considered, and the reasons for the particular order — or denial thereof — would be an appropriate and preferable practice to be followed.

We remand this case to the single justice for the entry of an order transferring it to the Municipal Court of the Dorchester District for proceedings consistent with this opinion.

*So ordered.*